# TOYOTA MOTOR MANUFACTURING, KENTUCKY, INC. *v.* WILLIAMS

No. 00–1089.   Argued November 7, 2001—Decided January 8, 2002

O'CONNOR, J., delivered the opinion for a unanimous Court.

*John G. Roberts, Jr.*, argued the cause for petitioner. With him on the briefs were *Jeffrey A. Savarise, John A. West*, and *Katherine A. Hessenbruch*.

*Barbara B. McDowell* argued the cause for the United States as *amicus curiae* in support of petitioner. On the brief were *Solicitor General Olson, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Clement, Malcolm L. Stewart, Marleigh D. Dover*, and *Charles W. Scarborough*.

*Robert Leslie Rosenbaum* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Trucking Associations, Inc., et al. by *Evan M. Tager* and *Miriam R. Nemetz;* for the Equal Employment Advisory Council et al. by *Ann Elizabeth Reesman, Katherine Y. K. Cheung, Jan S. Amundson*, and *Quentin Riegel;* and for Levi Strauss & Co. by *John C. Burgin, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, Michael H. Gottesman*, and *Laurence Gold;* for the Association of Trial Lawyers of America by *Jeffrey Robert White;* for the Judge David L. Bazelon Center for Mental Health Law et al. by *John Townsend Rich;* for the National Council on Disability by *Arlene Mayerson* and *Nancy L. Perkins;* and for the National Employment Lawyers Association by *Noah D. Lebowitz* and *Paula A. Brantner.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Under the Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 328, 42 U. S. C. § 12101 *et seq.* (1994 ed. and Supp. V), a physical impairment that "substantially limits one or more . . . major life activities" is a "disability." 42 U. S. C. § 12102(2)(A) (1994 ed.). Respondent, claiming to be disabled because of her carpal tunnel syndrome and other related impairments, sued petitioner, her former employer, for failing to provide her with a reasonable accommodation as required by the ADA. See § 12112(b)(5)(A). The District Court granted summary judgment to petitioner, finding that respondent's impairments did not substantially limit any of her major life activities. The Court of Appeals for the Sixth Circuit reversed, finding that the impairments substantially limited respondent in the major life activity of performing manual tasks, and therefore granting partial summary judgment to respondent on the issue of whether she was disabled under the ADA. We conclude that the Court of Appeals did not apply the proper standard in making this determination because it analyzed only a limited class of manual tasks and failed to ask whether respondent's impairments prevented or restricted her from performing tasks that are of central importance to most people's daily lives.

I

Respondent began working at petitioner's automobile manufacturing plant in Georgetown, Kentucky, in August 1990. She was soon placed on an engine fabrication assembly line, where her duties included work with pneumatic tools. Use of these tools eventually caused pain in respondent's hands, wrists, and arms. She sought treatment at petitioner's in-house medical service, where she was diagnosed with bilateral carpal tunnel syndrome and bilateral tendinitis. Respondent consulted a personal physician who placed her on permanent work restrictions that precluded her from lifting more than 20 pounds or from "frequently lifting or

carrying . . . objects weighing up to 10 pounds," engaging in "constant repetitive . . . flexion or extension of [her] wrists or elbows," performing "overhead work," or using "vibratory or pneumatic tools." Brief for Respondent 2; App. 45–46.

In light of these restrictions, for the next two years petitioner assigned respondent to various modified duty jobs. Nonetheless, respondent missed some work for medical leave, and eventually filed a claim under the Kentucky Workers' Compensation Act. Ky. Rev. Stat. Ann. § 342.0011 *et seq.* (1997 and Supp. 2000). The parties settled this claim, and respondent returned to work. She was unsatisfied by petitioner's efforts to accommodate her work restrictions, however, and responded by bringing an action in the United States District Court for the Eastern District of Kentucky alleging that petitioner had violated the ADA by refusing to accommodate her disability. That suit was also settled, and as part of the settlement, respondent returned to work in December 1993.

Upon her return, petitioner placed respondent on a team in Quality Control Inspection Operations (QCIO). QCIO is responsible for four tasks: (1) "assembly paint"; (2) "paint second inspection"; (3) "shell body audit"; and (4) "ED surface repair." App. 19. Respondent was initially placed on a team that performed only the first two of these tasks, and for a couple of years, she rotated on a weekly basis between them. In assembly paint, respondent visually inspected painted cars moving slowly down a conveyor. She scanned for scratches, dents, chips, or any other flaws that may have occurred during the assembly or painting process, at a rate of one car every 54 seconds. When respondent began working in assembly paint, inspection team members were required to open and shut the doors, trunk, and/or hood of each passing car. Sometime during respondent's tenure, however, the position was modified to include only visual inspection with few or no manual tasks. Paint second inspection required team members to use their hands to wipe each

painted car with a glove as it moved along a conveyor. *Id.*, at 21–22. The parties agree that respondent was physically capable of performing both of these jobs and that her performance was satisfactory.

During the fall of 1996, petitioner announced that it wanted QCIO employees to be able to rotate through all four of the QCIO processes. Respondent therefore received training for the shell body audit job, in which team members apply a highlight oil to the hood, fender, doors, rear quarter panel, and trunk of passing cars at a rate of approximately one car per minute. The highlight oil has the viscosity of salad oil, and employees spread it on cars with a sponge attached to a block of wood. After they wipe each car with the oil, the employees visually inspect it for flaws. Wiping the cars required respondent to hold her hands and arms up around shoulder height for several hours at a time.

A short while after the shell body audit job was added to respondent's rotations, she began to experience pain in her neck and shoulders. Respondent again sought care at petitioner's in-house medical service, where she was diagnosed with myotendinitis bilateral periscapular, an inflammation of the muscles and tendons around both of her shoulder blades; myotendinitis and myositis bilateral forearms with nerve compression causing median nerve irritation; and thoracic outlet compression, a condition that causes pain in the nerves that lead to the upper extremities. Respondent requested that petitioner accommodate her medical conditions by allowing her to return to doing only her original two jobs in QCIO, which respondent claimed she could still perform without difficulty.

The parties disagree about what happened next. According to respondent, petitioner refused her request and forced her to continue working in the shell body audit job, which caused her even greater physical injury. According to petitioner, respondent simply began missing work on a regular basis. Regardless, it is clear that on December 6, 1996, the

last day respondent worked at petitioner's plant, she was placed under a no-work-of-any-kind restriction by her treating physicians. On January 27, 1997, respondent received a letter from petitioner that terminated her employment, citing her poor attendance record.

Respondent filed a charge of disability discrimination with the Equal Employment Opportunity Commission (EEOC). After receiving a right to sue letter, respondent filed suit against petitioner in the United States District Court for the Eastern District of Kentucky. Her complaint alleged that petitioner had violated the ADA and the Kentucky Civil Rights Act, Ky. Rev. Stat. Ann. § 344.010 *et seq.* (1997 and Supp. 2000), by failing to reasonably accommodate her disability and by terminating her employment. Respondent later amended her complaint to also allege a violation of the Family and Medical Leave Act of 1993 (FMLA), 107 Stat. 6, as amended, 29 U. S. C. § 2601 *et seq.* (1994 ed. and Supp. V).

Respondent based her claim that she was "disabled" under the ADA on the ground that her physical impairments substantially limited her in (1) manual tasks; (2) housework; (3) gardening; (4) playing with her children; (5) lifting; and (6) working, all of which, she argued, constituted major life activities under the Act. Respondent also argued, in the alternative, that she was disabled under the ADA because she had a record of a substantially limiting impairment and because she was regarded as having such an impairment. See 42 U. S. C. §§ 12102(2)(B)–(C) (1994 ed.).

After petitioner filed a motion for summary judgment and respondent filed a motion for partial summary judgment on her disability claims, the District Court granted summary judgment to petitioner. Civ. A. No. 97–135 (Jan. 26, 1999), App. to Pet. for Cert. A–23. The court found that respondent had not been disabled, as defined by the ADA, at the time of petitioner's alleged refusal to accommodate her, and that she had therefore not been covered by the Act's protections or by the Kentucky Civil Rights Act, which is con-

strued consistently with the ADA. *Id.*, at A–29, A–34 to A–47. The District Court held that respondent had suffered from a physical impairment, but that the impairment did not qualify as a disability because it had not "substantially limit[ed]" any "major life activit[y]," 42 U. S. C. § 12102(2)(A). App. to Pet. for Cert. A–34 to A–42. The court rejected respondent's arguments that gardening, doing housework, and playing with children are major life activities. *Id.*, at A–35 to A–36. Although the court agreed that performing manual tasks, lifting, and working are major life activities, it found the evidence insufficient to demonstrate that respondent had been substantially limited in lifting or working. *Id.*, at A–36 to A–42. The court found respondent's claim that she was substantially limited in performing manual tasks to be "irretrievably contradicted by [respondent's] continual insistence that she could perform the tasks in assembly [paint] and paint [second] inspection without difficulty." *Id.*, at A–36. The court also found no evidence that respondent had had a record of a substantially limiting impairment, *id.*, at A–43, or that petitioner had regarded her as having such an impairment, *id.*, at A–46 to A–47.

The District Court also rejected respondent's claim that her termination violated the ADA and the Kentucky Civil Rights Act. The court found that even if it assumed that respondent was disabled at the time of her termination, she was not a "qualified individual with a disability," 42 U. S. C. § 12111(8) (1994 ed.), because, at that time, her physicians had restricted her from performing work of any kind, App. to Pet. for Cert. A–47 to A–50. Finally, the court found that respondent's FMLA claim failed, because she had not presented evidence that she had suffered any damages available under the FMLA. *Id.*, at A–50 to A–54.

Respondent appealed all but the gardening, housework, and playing-with-children rulings. The Court of Appeals for the Sixth Circuit reversed the District Court's ruling on whether respondent was disabled at the time she sought an

accommodation, but affirmed the District Court's rulings on respondent's FMLA and wrongful termination claims. 224 F. 3d 840 (2000). The Court of Appeals held that in order for respondent to demonstrate that she was disabled due to a substantial limitation in the ability to perform manual tasks at the time of her accommodation request, she had to "show that her manual disability involve[d] a 'class' of manual activities affecting the ability to perform tasks at work." *Id.*, at 843. Respondent satisfied this test, according to the Court of Appeals, because her ailments "prevent[ed] her from doing the tasks associated with certain types of manual assembly line jobs, manual product handling jobs and manual building trade jobs (painting, plumbing, roofing, etc.) that require the gripping of tools and repetitive work with hands and arms extended at or above shoulder levels for extended periods of time." *Ibid.* In reaching this conclusion, the court disregarded evidence that respondent could "ten[d] to her personal hygiene [and] carr[y] out personal or household chores," finding that such evidence "does not affect a determination that her impairment substantially limit[ed] her ability to perform the range of manual tasks associated with an assembly line job," *ibid.* Because the Court of Appeals concluded that respondent had been substantially limited in performing manual tasks and, for that reason, was entitled to partial summary judgment on the issue of whether she was disabled under the Act, it found that it did not need to determine whether respondent had been substantially limited in the major life activities of lifting or working, *ibid.*, or whether she had had a "record of" a disability or had been "regarded as" disabled, *id.*, at 844.

We granted certiorari, 532 U. S. 970 (2001), to consider the proper standard for assessing whether an individual is substantially limited in performing manual tasks. We now reverse the Court of Appeals' decision to grant partial summary judgment to respondent on the issue of whether she was substantially limited in performing manual tasks at the

time she sought an accommodation. We express no opinion on the working, lifting, or other arguments for disability status that were preserved below but which were not ruled upon by the Court of Appeals.

## II

The ADA requires covered entities, including private employers, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U. S. C. § 12112(b)(5)(A) (1994 ed.); see also § 12111(2) ("The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee"). The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). In turn, a "disability" is:

> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> "(B) a record of such an impairment; or
> "(C) being regarded as having such an impairment."
> § 12102(2).

There are two potential sources of guidance for interpreting the terms of this definition—the regulations interpreting the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U. S. C. § 706(8)(B) (1988 ed.), and the EEOC regulations interpreting the ADA. Congress drew the ADA's definition of disability almost verbatim from the definition of "handicapped individual" in the Rehabilitation Act, § 706(8)(B), and Congress' repetition of a well-established term generally implies that Congress intended the term to be construed

in accordance with pre-existing regulatory interpretations. *Bragdon* v. *Abbott*, 524 U. S. 624, 631 (1998); *FDIC* v. *Philadelphia Gear Corp.*, 476 U. S. 426, 437–438 (1986); *ICC* v. *Parker*, 326 U. S. 60, 65 (1945). As we explained in *Bragdon* v. *Abbott, supra,* at 631, Congress did more in the ADA than suggest this construction; it adopted a specific statutory provision directing as follows:

> "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U. S. C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title." 42 U. S. C. § 12201(a) (1994 ed.).

The persuasive authority of the EEOC regulations is less clear. As we have previously noted, see *Sutton* v. *United Air Lines, Inc.*, 527 U. S. 471, 479 (1999), no agency has been given authority to issue regulations interpreting the term "disability" in the ADA. Nonetheless, the EEOC has done so. See 29 CFR §§ 1630.2(g)–(j) (2001). Because both parties accept the EEOC regulations as reasonable, we assume without deciding that they are, and we have no occasion to decide what level of deference, if any, they are due. See *Sutton* v. *United Air Lines, Inc., supra,* at 480; *Albertson's, Inc.* v. *Kirkingburg,* 527 U. S. 555, 563, n. 10 (1999).

To qualify as disabled under subsection (A) of the ADA's definition of disability, a claimant must initially prove that he or she has a physical or mental impairment. See 42 U. S. C. § 12102(2)(A). The Rehabilitation Act regulations issued by the Department of Health, Education, and Welfare (HEW) in 1977, which appear without change in the current regulations issued by the Department of Health and Human Services, define "physical impairment," the type of impairment relevant to this case, to mean "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological;

musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine." 45 CFR § 84.3(j)(2)(i) (2001). The HEW regulations are of particular significance because at the time they were issued, HEW was the agency responsible for coordinating the implementation and enforcement of § 504 of the Rehabilitation Act, 29 U. S. C. § 794 (1994 ed. and Supp. V), which prohibits discrimination against individuals with disabilities by recipients of federal financial assistance. *Bragdon* v. *Abbott, supra,* at 632 (citing *Consolidated Rail Corporation* v. *Darrone,* 465 U. S. 624, 634 (1984)).

Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity. See 42 U. S. C. § 12102(2)(A) (1994 ed.). The HEW Rehabilitation Act regulations provide a list of examples of "major life activities" that includes "walking, seeing, hearing," and, as relevant here, "performing manual tasks." 45 CFR § 84.3(j)(2)(ii) (2001).

To qualify as disabled, a claimant must further show that the limitation on the major life activity is "substantia[l]." 42 U. S. C. § 12102(2)(A). Unlike "physical impairment" and "major life activities," the HEW regulations do not define the term "substantially limits." See Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 42 Fed. Reg. 22676, 22685 (1977) (stating HEW's position that a definition of "substantially limits" was not possible at that time). The EEOC, therefore, has created its own definition for purposes of the ADA. According to the EEOC regulations, "substantially limit[ed]" means "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to

the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 CFR § 1630.2(j) (2001). In determining whether an individual is substantially limited in a major life activity, the regulations instruct that the following factors should be considered: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." §§ 1630.2(j)(2)(i)–(iii).

## III

The question presented by this case is whether the Sixth Circuit properly determined that respondent was disabled under subsection (A) of the ADA's disability definition at the time that she sought an accommodation from petitioner. 42 U. S. C. § 12102(2)(A). The parties do not dispute that respondent's medical conditions, which include carpal tunnel syndrome, myotendinitis, and thoracic outlet compression, amount to physical impairments. The relevant question, therefore, is whether the Sixth Circuit correctly analyzed whether these impairments substantially limited respondent in the major life activity of performing manual tasks. Answering this requires us to address an issue about which the EEOC regulations are silent: what a plaintiff must demonstrate to establish a substantial limitation in the specific major life activity of performing manual tasks.

Our consideration of this issue is guided first and foremost by the words of the disability definition itself. "[S]ubstantially" in the phrase "substantially limits" suggests "considerable" or "to a large degree." See Webster's Third New International Dictionary 2280 (1976) (defining "substantially" as "in a substantial manner" and "substantial" as "considerable in amount, value, or worth" and "being that specified to a large degree or in the main"); see also 17 Oxford English Dictionary 66–67 (2d ed. 1989) ("substantial": "[r]elating to

or proceeding from the essence of a thing; essential"; "[o]f ample or considerable amount, quantity, or dimensions"). The word "substantial" thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities. Cf. *Albertson's, Inc.* v. *Kirkingburg*, 527 U. S., at 565 (explaining that a "mere difference" does not amount to a "significant restric-[tion]" and therefore does not satisfy the EEOC's interpretation of "substantially limits").

"Major" in the phrase "major life activities" means important. See Webster's, *supra*, at 1363 (defining "major" as "greater in dignity, rank, importance, or interest"). "Major life activities" thus refers to those activities that are of central importance to daily life. In order for performing manual tasks to fit into this category—a category that includes such basic abilities as walking, seeing, and hearing—the manual tasks in question must be central to daily life. If each of the tasks included in the major life activity of performing manual tasks does not independently qualify as a major life activity, then together they must do so.

That these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled is confirmed by the first section of the ADA, which lays out the legislative findings and purposes that motivate the Act. See 42 U. S. C. § 12101. When it enacted the ADA in 1990, Congress found that "some 43,000,000 Americans have one or more physical or mental disabilities." § 12101(a)(1). If Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher. Cf. *Sutton* v. *United Air Lines, Inc.*, 527 U. S., at 487 (finding that because more than 100 million people need corrective lenses to see properly, "[h]ad Congress intended to include all persons with corrected physical limitations among those covered by the Act, it undoubtedly would have cited a much

higher number [than 43 million] disabled persons in the findings").

We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term. See 29 CFR §§ 1630.2(j)(2)(ii)–(iii) (2001).

It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Albertson's, Inc.* v. *Kirkingburg, supra,* at 567 (holding that monocular vision is not invariably a disability, but must be analyzed on an individual basis, taking into account the individual's ability to compensate for the impairment). That the Act defines "disability" "with respect to an individual," 42 U. S. C. § 12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner. See *Sutton* v. *United Air Lines, Inc., supra,* at 483; *Albertson's, Inc.* v. *Kirkingburg, supra,* at 566; cf. *Bragdon* v. *Abbott,* 524 U. S., at 641–642 (relying on unchallenged testimony that the respondent's HIV infection controlled her decision not to have a child, and declining to consider whether HIV infection is a *per se* disability under the ADA); 29 CFR pt. 1630, App. § 1630.2(j) (2001) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"); *ibid.* ("The determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis").

An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person. Carpal tunnel syndrome, one of respondent's impairments, is just such a condition. While cases of severe carpal tunnel syndrome are characterized by muscle atrophy and extreme sensory deficits, mild cases generally do not have either of these effects and create only intermittent symptoms of numbness and tingling. Carniero, Carpal Tunnel Syndrome: The Cause Dictates the Treatment, 66 Cleveland Clinic J. Medicine 159, 161–162 (1999). Studies have further shown that, even without surgical treatment, one quarter of carpal tunnel cases resolve in one month, but that in 22 percent of cases, symptoms last for eight years or longer. See DeStefano, Nordstrom, & Uierkant, Long-term Symptom Outcomes of Carpal Tunnel Syndrome and its Treatment, 22A J. Hand Surgery 200, 204–205 (1997). When pregnancy is the cause of carpal tunnel syndrome, in contrast, the symptoms normally resolve within two weeks of delivery. See Ouellette, Nerve Compression Syndromes of the Upper Extremity in Women, 17 J. of Musculoskeletal Medicine 536 (2000). Given these large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has·a disability within the meaning of the ADA.

IV

The Court of Appeals' analysis of respondent's claimed disability suggested that in order to prove a substantial limitation in the major life activity of performing manual tasks, a "plaintiff must show that her manual disability involves a 'class' of manual activities," and that those activities "affec[t] the ability to perform tasks at work." See 224 F. 3d, at 843. Both of these ideas lack support.

The Court of Appeals relied on our opinion in *Sutton* v. *United Air Lines, Inc.,* for the idea that a "class" of manual

activities must be implicated for an impairment to substantially limit the major life activity of performing manual tasks. 224 F. 3d, at 843. But *Sutton* said only that *"[w]hen the major life activity under consideration is that of working*, the statutory phrase 'substantially limits' requires . . . that plaintiffs allege they are unable to work in a broad class of jobs." 527 U. S., at 491 (emphasis added). Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today. In *Sutton*, we noted that even assuming that working is a major life activity, a claimant would be required to show an inability to work in a "broad range of jobs," rather than a specific job. *Id.*, at 492. But *Sutton* did not suggest that a class-based analysis should be applied to any major life activity other than working. Nor do the EEOC regulations. In defining "substantially limits," the EEOC regulations only mention the "class" concept in the context of the major life activity of working. 29 CFR § 1630.2(j)(3) (2001) ("With respect to the major life activity of *working[,]* [t]he term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities"). Nothing in the text of the Act, our previous opinions, or the regulations suggests that a class-based framework should apply outside the context of the major life activity of working.

While the Court of Appeals in this case addressed the different major life activity of performing manual tasks, its analysis circumvented *Sutton* by focusing on respondent's inability to perform manual tasks associated only with her job. This was error. When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the

claimant is unable to perform the tasks associated with her specific job. Otherwise, *Sutton's* restriction on claims of disability based on a substantial limitation in working will be rendered meaningless because an inability to perform a specific job always can be recast as an inability to perform a "class" of tasks associated with that specific job.

There is also no support in the Act, our previous opinions, or the regulations for the Court of Appeals' idea that the question of whether an impairment constitutes a disability is to be answered only by analyzing the effect of the impairment in the workplace. Indeed, the fact that the Act's definition of "disability" applies not only to Title I of the Act, 42 U. S. C. §§ 12111–12117 (1994 ed.), which deals with employment, but also to the other portions of the Act, which deal with subjects such as public transportation, §§ 12141–12150, 42 U. S. C. §§ 12161–12165 (1994 ed. and Supp. V), and privately provided public accommodations, §§ 12181–12189, demonstrates that the definition is intended to cover individuals with disabling impairments regardless of whether the individuals have any connection to a workplace.

Even more critically, the manual tasks unique to any particular job are not necessarily important parts of most people's lives. As a result, occupation-specific tasks may have only limited relevance to the manual task inquiry. In this case, "repetitive work with hands and arms extended at or above shoulder levels for extended periods of time," 224 F. 3d, at 843, the manual task on which the Court of Appeals relied, is not an important part of most people's daily lives. The court, therefore, should not have considered respondent's inability to do such manual work in her specialized assembly line job as sufficient proof that she was substantially limited in performing manual tasks.

At the same time, the Court of Appeals appears to have disregarded the very type of evidence that it should have focused upon. It treated as irrelevant "[t]he fact that [respondent] can . . . ten[d] to her personal hygiene [and] carr[y]

out personal or household chores." *Ibid.* Yet household chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives, and should have been part of the assessment of whether respondent was substantially limited in performing manual tasks.

The District Court noted that at the time respondent sought an accommodation from petitioner, she admitted that she was able to do the manual tasks required by her original two jobs in QCIO. App. to Pet. for Cert. A–36. In addition, according to respondent's deposition testimony, even after her condition worsened, she could still brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house. App. 32–34. The record also indicates that her medical conditions caused her to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances. *Id.,* at 32, 38–39. But these changes in her life did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law. On this record, it was therefore inappropriate for the Court of Appeals to grant partial summary judgment to respondent on the issue of whether she was substantially limited in performing manual tasks, and its decision to do so must be reversed.

In its brief on the merits, petitioner asks us to reinstate the District Court's grant of summary judgment to petitioner on the manual task issue. In its petition for certiorari, however, petitioner did not seek summary judgment; it argued only that the Court of Appeals' reasons for granting partial summary judgment to respondent were unsound. This Court's Rule 14.1(a) provides: "Only the questions set out in the petition, or fairly included therein, will be considered by the Court." The question of whether petitioner was entitled to summary judgment on the manual task issue is

therefore not properly before us.   See *Irvine* v. *California*, 347 U. S. 128, 129–130 (1954).

Accordingly, we reverse the Court of Appeals' judgment granting partial summary judgment to respondent and remand the case for further proceedings consistent with this opinion.

*So ordered.*