United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 19, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

Summary Calendar
No. 04-40190
_____

FERNANDO CALDERON

Plaintiff - Appellant

v.

JOHN E POTTER, Postmaster General; WILLIAM J HENDERSON,
Postmaster General

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
No. C-02-CV-512

Before KING, Chief Judge, and WIENER and GARZA, Circuit Judges.

PER CURIAM:[*]

    Fernando Calderon filed this suit for disability
discrimination and retaliation against the Postmaster General
after his employer, the United States Postal Service, refused for
a period of time to permit him to return to work as a letter
carrier because of injuries to his arms.  Calderon now alleges
that the district court erred when it granted summary judgment

_____

    [*]    Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

1

for the defendant on his disability discrimination and retaliation claims.  For the following reasons, we AFFIRM the judgment of the district court.

## I. Factual And Procedural Background

Fernando Calderon has worked for the United States Postal Service ("USPS") for over twenty-five years, most of the time as a letter carrier.  In June 1998, Calderon's physician, Dr. Charles Breckenridge, diagnosed him as suffering from repetitive motion injuries to his shoulders and elbows, specifically bilateral elbow lateral epicondylitis and impingement syndrome with early arthritis and tendinitis.  Accordingly, in May 1999, Calderon had the first of four surgeries for these injuries. Prior to surgery, he filed a Notice of Occupational Disease with the USPS to receive workers' compensation coverage for his injuries.  Following each surgery, he took leave from work for several weeks to recover.

After Calderon's first surgery, he returned to his job with the USPS as a letter carrier.  Subsequently, the USPS accepted his occupational disease claim.  However, on July 20, 2000, Dr. Robert Jones, a physician working for the USPS, examined Calderon and found that he was unfit to work as a letter carrier as a result of his shoulder and elbow condition.  Accordingly, Calderon was reassigned to non-carrier duties.

On January 9, 2001, Postmaster Cathy Polderman convened a meeting where she told Calderon that she would not accept a

2

medical release from his doctor saying that he could return to work as a letter carrier. She then told Calderon that he could: (1) accept a voluntary assignment to a clerk position; (2) be involuntarily assigned to a clerk position; or (3) take medical disability retirement. On February 5, 2001, Calderon contacted an EEO counselor about this January 9, 2001 meeting. On March 27, 2001, after having two more surgeries, Calderon filed an EEO Complaint, challenging the USPS's refusal to let him return to work as a letter carrier.

On August 1, 2001, after Calderon's final surgery, Dr. Breckenridge released Calderon to full duty without restrictions. The USPS did not, however, return Calderon to his previous position as a letter carrier. Instead, on August 16, 2001, Postmaster Polderman wrote to Dr. Jones, the physician who had previously evaluated Calderon for the USPS, and requested that he provide a medical opinion as to whether Calderon could return to his position as a letter carrier. On August 21, 2001, Dr. Jones replied to Postmaster Polderman by letter, repeating that Calderon was still not fit for duty as a letter carrier. Dr. Jones further stated that "there are no restrictions that I know of that will allow the subject to perform the duties of City Carrier or any other job available at the Post Office." Dr. Jones noted in his letter that his conclusion that Calderon was not fit for duty was based upon the evaluation of Calderon that he conducted on July 20, 2000, nearly a year earlier.

On September 12, 2001, an EEO investigator sent Postmaster Polderman a series of questions regarding Calderon's EEO complaint.  Subsequently, on November 8, 2001, Postmaster Polderman convened a meeting to discuss Calderon's work status. At that meeting, she told Calderon that the following jobs were available to him for reassignment: (1) clerk in Ingleside; (2) mailhandler in Corpus Christi; (3) custodian in Corpus Christi; (4) mail processor in Corpus Christi; and (5) window clerk in Corpus Christi.  Calderon refused to be voluntarily reassigned to any of these positions, contending that his doctor had cleared him to return to his position as a letter carrier.

On January 23, 2002, Calderon received a letter from David Cotham, a USPS manager, stating:

> On November 8, 2001, a work status meeting was held during which we discussed job opportunities within your work restrictions.  During the meeting, you refused reassignment as a window or distribution clerk. Considering your medical restrictions, I would agree that those duties would not be within your permanent medical restrictions.
>
> In reviewing available job assignments, Personnel records indicate that there is available a custodian position in the Plant on Tour 1, from 11:00 p.m. to 7:30 a.m., Wednesday and Thursday off.  The duties of this custodial position are within your permanent medical restrictions.  There are no other funded, vacant positions within your medical restrictions. Therefore, this is to advise you that this custodial position is being offered to you as a permanent reassignment.
>
> Please let me know by February 1, 2002 if you accept or reject this job offer.  Your failure to accept said offer will result in your separation from the Postal Service.

4

On January 31, 2002, Calderon rejected the custodial position. In response, on February 28, 2002, the USPS sent Calderon a Notice of Proposed Enforced Leave that involuntarily placed him on leave with pay.

On April 1, 2002, while Calderon was still on enforced leave, Postmaster Polderman sent a letter to him instructing him to report to Dr. Jones for a fitness-for-duty exam. Subsequently, he was told instead to report to Dr. Theodore Parsons, which he did on April 12, 2002. After the exam, Dr. Parsons cleared Calderon to return to work as a letter carrier. On May 11, 2002, Calderon returned to his position as a letter carrier. In total, Calderon was on enforced leave from February 28, 2002 until May 10, 2002.

On November 22, 2002, Calderon filed this lawsuit against the Postmaster General, alleging two claims under the Rehabilitation Act, 29 U.S.C. §§ 701-796: (1) unlawful disability discrimination by the USPS as a result of its refusal to permit him to return to his position as a letter carrier for a period of time after his surgeries; and (2) unlawful retaliation by the USPS for placing him on enforced leave and reassigning him to non-letter-carrier duties because he filed an EEO complaint. The defendant subsequently filed a motion for summary judgment, and Calderon filed a motion for partial summary judgment. On January 13, 2004, the district court granted the defendant's motion for

5

summary judgment and denied Calderon's motion.  Calderon subsequently filed the present appeal.

## II. Standard of Review

This court reviews a district court's grant of summary judgment de novo, applying the same standard as the district court.  See Fierros v. Tex. Dep't. of Health, 274 F.3d 187, 190 (5th Cir. 2001).  According to the Supreme Court, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)).  The party moving for summary judgment "must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." Byers v. Dallas Morning News, Inc., 209 F.3d 419, 424 (5th Cir. 2000).  Conversely, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (holding that no issue for trial exists unless there is sufficient evidence for a jury to return a verdict for the nonmoving party).  When a district court reviews the support for a nonmovant's case, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson, 477 U.S. at 255.

## III. Discussion

Calderon raises two issues on appeal.  First, he maintains that the district court erred in granting summary judgment on his disability discrimination claim.  Second, he asserts that the district court erred when it granted summary judgment on his retaliation claim.  We examine each claim in turn.

### 1.  Disability Discrimination

Calderon first claims that the district court incorrectly granted summary judgment in favor of the defendant on his disability discrimination claim under the Rehabilitation Act when it found that the USPS did not regard Calderon as being disabled. According to Calderon, the evidence shows that the USPS--in particular, Postmaster Polderman--regarded him as being disabled. Accordingly, he contends that he should be allowed to proceed with his disability discrimination claim.

While Calderon does not claim to have been disabled, he contends that the USPS regarded him as having an impairment that prevented him from performing the major life activity of performing manual tasks.  In support of this contention, he invites the court's attention to Dr. Jones's August 21, 2001 letter to the USPS, in which Dr. Jones stated that "there are no restrictions that I know of that will allow the subject to perform the duties of City Carrier or any other job available at the Post Office."  Additionally, he notes that Postmaster Polderman signed an EEO Investigative Affidavit on November 26,

2001, in which she was asked: "Were you aware the Complainant had a physical impairment?  If so, how and when did you become aware?"  Postmaster Polderman responded that "I was aware that Mr. Calderon had several surgeries from Dave Cotham and Mr. Calderon's records."  Finally, he notes that in David Cotham's January 23, 2002 letter to him, Cotham stated that working as a distribution or window clerk would not be within Calderon's "permanent medical restrictions."  Based on this evidence, Calderon claims that, contrary to the findings of the district court, the USPS regarded him as being substantially limited in the major life activity of performing manual tasks.  Thus, he contends that he should be allowed to pursue his disability discrimination claim against the USPS.

Under the Rehabilitation Act, an individual claiming discrimination must show that he: (1) is an "individual with a disability;" (2) was "otherwise qualified" for the job in question; (3) worked for a "program or activity receiving Federal financial assistance"; and (4) was discriminated against "solely by reason of her or his disability."  Hileman v. City of Dallas, 115 F.3d 352, 353 (5th Cir. 1997) (quoting 29 U.S.C. § 794(a)). The standards used for determining whether the Rehabilitation Act has been violated in an employment discrimination suit are the same as the standards for determining if the Americans with Disabilities Act ("ADA") has been violated in an employment discrimination suit.  29 U.S.C. § 791(g) (2000).  Under the ADA,

8

an individual has a "disability" if he: (A) has a physical or mental impairment that substantially limits one or more of his major life activities; (B) has a record of such an impairment; or (C) has been regarded as having such an impairment. 42 U.S.C. § 12102(2) (2000); Rogers v. Int'l Marine Terminals, Inc. 87 F.3d. 755, 758 (5th Cir. 1996). Since Calderon does not assert that he was disabled or had a record of a disability but merely claims that the USPS regarded him as such, this court need only consider whether the USPS considered him to be substantially limited in the performance of one or more major life activities (i.e., the court need only consider the third way of establishing a "disability" under the ADA). See 42 U.S.C. § 12102(2).

According to EEOC regulations, "major life activities" are things such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." McInnis v. Alamo Cmty. Coll. Dist., 207 F.3d 276, 280 (5th Cir. 2000) (quoting 29 C.F.R. § 1630.2). A person is regarded as being significantly restricted in a major life activity when he (1) has an impairment that is not substantially limiting but which his employer considers to be substantially limiting; (2) has an impairment which is substantially limiting only because of others' attitudes; or (3) has no impairment but is perceived by his employer as having a substantially limiting impairment. Bridges v. City of Bossier, 92 F.3d 329, 332 (citing Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727-28 n.19 (5th

9

Cir. 1995)).

Calderon's disability discrimination claim fails because he has put forward no evidence showing that the USPS regarded him as being substantially limited in performing manual tasks. In Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, the Supreme Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." 534 U.S. 184, 198 (2002). The Court further stated that "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." Id. at 200-01. Calderon has offered no evidence whatsoever that the USPS regarded him as being unable to perform manual tasks of central importance to daily life. To the contrary, the summary judgment evidence shows that while Calederon was recovering from his surgeries, the USPS repeatedly offered him jobs that involved performing manual tasks. For instance, at the November 8, 2001 meeting convened by Postmaster Polderman, the USPS told Calderon that five jobs (mail processor, clerk, custodian, mail handler, and window clerk)--all of which would have required him to perform manual tasks--were available to him for reassignment. Similarly, in his letter of January 23, 2002,

David Cotham told Calderon that he would be placed on leave if he did not accept a custodial job, a position that would have required him to perform manual tasks.  Likewise, as the district court correctly pointed out, between August 3, 2001 and February 28, 2002, the USPS allowed Calderon to work in a non-letter-carrier position that required him to perform manual tasks.

While Calderon attempts to show that the USPS regarded him as being substantially limited by pointing to Dr. Jones's letter of August 21, 2001 (in which Dr. Jones stated that Calderon was unable to safely perform the duties of any job available at the Post Office), this attempt fails.  Without more, the existence of this letter does not suffice to raise an issue of material fact as to whether the USPS regarded Calderon as being substantially limited in the performance of a major life activity, since both before and after the letter was sent the USPS offered Calderon alternative jobs that would have required him to perform manual tasks.  Similarly, David Cotham's January 23, 2002 letter to Calderon does not create an issue of material fact as to whether the USPS regarded him as disabled.  In this letter, Gotham stated that working as a distribution or window clerk would not be within Calderon's permanent medical restrictions.  However, he then offered Calderon a job as a custodian--a position that would have required him to perform manual tasks--in this same letter.  Additionally, the USPS had offered Calderon numerous other jobs that would have required him to perform manual tasks before this

11

letter was written, all of which he rejected.  Accordingly, the USPS's consistent attempts to offer Calderon jobs entailing manual tasks belies Calderon's claim that it regarded him as being substantially limited with respect to the major life activity of performing manual tasks.  Thus, no material issues of fact exist, Calderon has failed to show that the USPS regarded him as being substantially impaired with respect to a major life activity, and the district court correctly granted summary judgment in favor of the defendant on Calderon's disability discrimination claim under the Rehabilitation Act.

### 2. Retaliation

Calderon next contends that the district court erred by granting summary judgment in favor of the defendant on his retaliation claim under the Rehabilitation Act.  According to Calderon, the USPS unlawfully retaliated against him by placing him on enforced leave because he filed an EEO complaint in March of 2001.  Likewise, he claims that the USPS reassigned him from his position as a letter carrier to other less-desirable positions in retaliation for filing his EEO complaint.

To establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show that: (1) he engaged in a protected activity (e.g., the filing of an EEO complaint); (2) his employer took an adverse employment action against him; and (3) a causal connection existed between the adverse employment

12

action and the protected activity.  Shannon v. Henderson, No. 01-10346, slip op. at 8-9 (5th Cir. Sep. 25, 2001); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2nd Cir. 2002); Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001), cert. denied, Gribcheck v. Potter, 534 U.S. 896 (2001).[1]  Once a plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to show that it had a legitimate nondiscriminatory reason for taking the adverse employment action.  Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002).  If the defendant provides a legitimate nondiscriminatory reason for the employment action, the burden shifts back to the plaintiff to show that the adverse action would not have occurred "but for" the protected activity.  See Long v. Eastfield Coll., 88 F.3d 300, 308 (5th Cir. 1996).

Even if Calderon has established a prima facie case of unlawful retaliation, the USPS has articulated a legitimate

---

[1]     In Shannon, the court noted that this circuit has never explicitly held that the framework for analyzing retaliation claims brought under the Rehabilitation Act is the same as that for analyzing retaliation claims under Title VII of the Civil Rights of Act of 1964 and the ADA.  Shannon v. Henderson, No. 01-10346, slip op. at 8 (5th Cir. Sep. 25, 2001).  The court then stated that both the language of the Rehabilitation Act and the findings of other circuits indicate that the same framework for analyzing Title VII and ADA retaliation claims should be applied to retaliation claims brought under the Rehabilitation Act.  Id. at 8-9 (citing 29 U.S.C. § 794(d); Gribchek, 245 F.3d at 550; Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001)).  Accordingly, the court in Shannon applied the standards for analyzing retaliation claims brought under the ADA and Title VII to the plaintiff's retaliation claim brought under the Rehabilitation Act.  For the reasons articulated by the Shannon court, we will use the same approach when analyzing Calderon's retaliation claim under the Rehabilitation Act.

13

nondiscriminatory reason for placing him on enforced leave: it felt he could no longer perform the duties of a letter carrier and, although it had repeatedly tried to reassign him, he refused every job offered to him. Calderon, on the other hand, has not rebutted this claim by showing that he would not have been placed on enforced leave or reassigned "but for" the fact that he filed an EEO complaint. The summary judgment evidence supports the USPS's justification for reassigning Calderon and placing him on enforced leave. First, it shows that the USPS first reassigned Calderon from his letter carrier duties in November of 2000, well before he filed his EEO complaint in March of 2001. It further shows that the USPS told Calderon that he could not return to his position as a letter carrier--and offered him at least five alternate jobs instead--before he filed his EEO complaint. Moreover, the summary judgment evidence (including David Cotham's January 23, 2002 letter to Calderon) shows that the USPS placed Calderon on enforced leave only after he (1) repeatedly refused to accept every job offered to him by the USPS and (2) was warned that failure to accept the USPS's latest job offer would result in his separation from the USPS.

In response to the USPS's alleged nondiscriminatory reason for placing Calderon on enforced leave, Calderon has put forward no evidence whatsoever showing that his placement on leave, which occurred nearly a year after he filed his EEO complaint, was in any way related to the filing of his EEO complaint. Accordingly,

14

he has not shown that a fact question exists as to whether he would not have been placed on leave "but for" the filing of his EEO complaint. Similarly, Calderon has offered no evidence showing that the USPS reassigned him from his letter carrier position--an event that occurred before he filed his EEO complaint--in retaliation for filing his EEO complaint. Finally, he has put forward no evidence that the USPS's purpose in telling him that he could either become a custodian or be separated from the USPS was to retaliate against him for his EEO complaint. The USPS, on the other hand, has provided a legitimate nondiscriminatory reason for its decision to give him this choice (i.e., it gave him this choice because he had rejected every other job offer made by the USPS). Furthermore, the decision to give Calderon this choice was wholly consistent with the reassignments that began <u>before</u> Calderon ever filed his EEO complaint. Accordingly, no material questions of fact exist, Calderon's retaliation claim under the Rehabilitation Act fails, and the district court correctly granted summary judgment on this claim in favor of the defendant.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's decision granting summary judgment in favor of the defendant.