**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0819n.06**
**Filed: November 7, 2006**

**No. 06-5269**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TERRY GREATHOUSE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| JOSEPH W. WESTFALL, SECRETARY OF | ) | WESTERN DISTRICT OF KENTUCKY |
| THE ARMY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: RYAN, BATCHELDER and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Terry Greathouse challenges the district court's decision, rejecting his disability-discrimination, constructive-discharge and retaliation claims as a matter of law. Because Greathouse has failed to raise a genuine issue of material fact as to any of these claims, we affirm.

I.

In 1979, Terry Greathouse started his career with the U.S. Army Corps of Engineers as a laborer. Three years later, he took a position as a lock-and-dam operator at the Cannelton Locks and Dam, near Cannelton, Indiana. The dam operates 24 hours a day with a staff of 15 to 21 people divided between 3 daily shifts. In 1995, Greathouse and a Cannelton coworker, Timothy Stewart,

developed a personality conflict, which escalated over time. The Corps' Crisis Intervention Team investigated, determining that Greathouse and Stewart were both to blame for the problem.

To give the men time to settle their differences, lockmaster Anthony Davis scheduled Greathouse and Stewart to work separate shifts for eight weeks. After that, if Greathouse and Stewart remained unable to work together, Davis stated in a memorandum to Greathouse that he would "be forced to take action to remove both [men] from [their] respective positions," because he could not "operate a high lift lock and dam facility when two of [his] shift employees cannot work together." JA 694.

Shortly after Greathouse received the memorandum, a psychiatrist evaluated him and diagnosed him with "[a]djustment disorder with mixed emotional features" and panic attacks. JA 1330. The psychiatrist prescribed medications to treat the ailments and recommended that Greathouse not work with Stewart. In March 1996, Greathouse filed a federal tort claim alleging that the hostile work environment at Cannelton had caused the illnesses and had forced him to seek counseling and psychiatric care.

On April 15, Davis informed Greathouse and Stewart that they had been scheduled to work the same shift starting on April 30. Stewart agreed to the shift, but Greathouse refused, telling Davis: "I fear for my safety, [Stewart's] safety, and the safety of my coworkers." JA 1340. In response to Greathouse's concerns, the Corps offered him a lower-graded position at Markland

Locks and Dam, though one where he would earn the same salary that he had earned at Cannelton. Greathouse rejected the offer on May 5.

The following month, the Corps advertised an opening for a lock-and-dam equipment-mechanic leader at its Green River site. Greathouse was the only person who applied for the job. The lockmaster in charge of filling the position advertised for the position again in late June and contacted four Corps employees to find out why they had not applied for the job the first time. Only Greathouse and Alan Perdue—one of the employees whom the lockmaster had contacted—submitted applications for the re-advertised position. The lockmaster chose Perdue for the job because he "felt Mr. Perdue was more qualified." JA 2101. On July 29, Greathouse lodged an informal EEOC complaint alleging disability discrimination.

Concluding that Cannelton could not run properly unless all of its employees could work together, the lock-and-dam project manager recommended on September 3 that Greathouse be removed from his position. On October 30, Greathouse filed a formal EEOC complaint about the agency's decision not to hire him for the Green River job. After considering the recommendation that Greathouse be removed from his position, the Corps decided instead to reassign him to a lock-and-dam-operator position at the McAlpine Lock and Dam in Louisville, Kentucky. Although Greathouse accepted the new assignment, he turned down the Corps' offer to move him at its expense, choosing instead to commute from his home to Louisville, 90 minutes away.

In January 1997, Greathouse began the process of filing another informal EEOC complaint, contending that the Corps had discriminated against him on the basis of disability by reassigning him to McAlpine. He filed the formal EEOC complaint a few months later.

On March 27, 1997, the Department of Defense Civilian Personnel Management Service Office (OCI), which had been investigating Greathouse's Green River complaint, concluded that Greathouse had failed to establish that he had a cognizable disability.

At roughly the same time, a doctor evaluated Greathouse and diagnosed him with irritable bowel syndrome and severe dysthymic disorder. The psychologist also noted that Greathouse showed "signs of depression, fatigue, agitation, loss of concentration, and anxiety all of which severely restrict[ed] his ability to maintain himself at his current job." JA 197.

On June 25, OCI issued a report regarding Greathouse's McAlpine complaint, again finding no evidence of discrimination because Greathouse had failed to establish that he was disabled. Investigators also concluded that the Corps had provided legitimate nondiscriminatory reasons for its reassignment decision.

The EEOC reached similar initial conclusions about the Green River and McAlpine complaints, finding that the Corps did not discriminate against Greathouse in either instance. The Department of the Army adopted the EEOC's recommendations regarding the Green River complaint on May 12, 1998 and regarding the McAlpine complaint on August 24, 1998. Greathouse unsuccessfully appealed both decisions to the EEOC.

In February 1999, Greathouse applied to the Office of Personnel Management for disability retirement benefits. His application was approved in January 2000.

One year later, he filed this lawsuit against the Corps, alleging disability discrimination, constructive discharge and retaliation, all in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*. The district court granted the Corps' motion for summary judgment on all three claims.

II.

Greathouse contends that the Corps twice discriminated against him on the basis of disability in violation of the Rehabilitation Act—first, when it overlooked him for the Green River job and, second, when it reassigned him to McAlpine. We disagree.

The Rehabilitation Act provides:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794(a). To bring a claim under the Act, Greathouse must prove that (1) he is an individual with a disability, (2) he is "otherwise qualified" to participate in the activity in question, (3) he "is being excluded from participation in, being denied the benefits of, or being subjected to discrimination . . . solely by reason of his" disability and (4) the program allegedly discriminating

against him receives federal funding. *Doherty v. So. College of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988).

An "individual with a disability," the Act says, includes "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). "Because the standards" for establishing a claim under the Rehabilitation Act and the Americans with Disabilities Act, including the definition of disability, "are largely the same, cases construing one statute are instructive in construing the other." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997).

Greathouse cannot satisfy any of the three options for establishing a cognizable disability. Listing his disabilities as "sleep apnea, chronic depression, irritable bowel syndrome, judgment disorder, and panic attacks," Br. at 2, he asserts that these medical conditions interfere with two major life activities—his ability to sleep and to work, *id.* at 16–17. Sleeping and working, it is true, both constitute major life activities. *See Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 315–17 (6th Cir. 2001) (treating sleep as a major life activity); *Black v. Roadway Express, Inc.*, 297 F.3d 445, 449–51 (6th Cir. 2002) (treating work as a major life activity). But Greathouse has not demonstrated that his ailments "substantially limit" his ability to engage in either activity.

"[S]ubstantially limits," the Supreme Court has observed, "creat[es] a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 197 (2002); *see*

*Mahon v. Crowell*, 295 F.3d 585, 592 (6th Cir. 2002). According to the EEOC regulations, the phrase means being "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a . . . major life activity as compared to the condition, manner, or duration under which the average person . . . can perform that . . . activity." 29 C.F.R. §§ 1630.2(j)(1)(i)–(ii); *see Sutton v. United Airlines*, 527 U.S. 471, 480 (1999).

Under these requirements, an individual must make a significant showing of sleep impairment before he can show that a substantial limitation exists. *See, e.g.*, *Swanson*, 268 F.3d at 316 ("While less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population."); *Boerst v. Gen. Mills Operations, Inc.*, 25 F. App'x 403, 407 (6th Cir. Jan. 15, 2002) ("Getting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation."). No less importantly, the courts consider an individual's ability to sleep *after* accounting for the mitigating effect of any medication prescribed for the condition. *See Sutton*, 527 U.S. at 488 (holding that disability determinations must be made "with reference to corrective measures").

Greathouse offers no evidence of the precise impact that his ailments have on his sleep patterns, and he nowhere explains how his illness significantly restricts the manner or duration of his sleep as compared to that of the average person. The reports from his physicians variously generalize that he "has trouble sleeping throughout the night," JA 1329, that he has "difficulty

sleeping most nights," JA 1455, that he has "insomnia," JA 1459, that he told his doctor "he sleeps fairly well during the day but every night he cannot sleep if he doesn't take a pill," *id.*, and that he is in a "state of emotional upheaval characterized by . . . sleeplessness," JA 1454. Greathouse added, "I have problems with my sleep, [and] I medicate myself to sleep every night." JA 1104. These general statements regarding his sleeping problems, without more, cannot sustain a claim that his ability to sleep has been substantially limited by his ailments. *See Toyota Motor Mfg.*, 534 U.S. at 198 ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."). And because Greathouse by his own admission has successfully mitigated his sleep problems through medication, he necessarily cannot show that this condition amounts to a recognizable disability. *See Sutton*, 527 U.S. at 488–89.

Also unconvincing is Greathouse's claim that his illnesses substantially limit his ability to work. When working is the major life activity at issue, "'substantially limits' requires, at a minimum, that plaintiff[ ] allege [he is] unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491; *see also* 29 C.F.R. § 1630.2(j)(3)(i). Greathouse's illnesses may have rendered him unable to perform one job—working as a lock-and-dam operator on the same shift as Timothy Stewart—but not a broad range of jobs or even a class of jobs. "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 597 (6th Cir. 1999).

Greathouse's employment record reinforces the conclusion that his ailments have not substantially limited his ability to work. Since retiring from the Corps, the record shows that

Greathouse has served as a substitute teacher, an administrator of an industrial training program, a welder, a car salesman, a glass salesman and a factory helper. Although these positions may not require the same skill set as his Corps jobs did, "[i]f jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs." *Sutton*, 527 U.S. at 492; *see also Mahon*, 295 F.3d at 591 ("To be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice. . . . [I]f a host of different types of jobs are available, one is not precluded from a broad range of jobs."). Because Greathouse has failed to demonstrate that any of his medical conditions—alone or in concert—constitutes an impairment that substantially limits his ability to sleep or work, he does not qualify as an individual with a disability under the first prong of the Act's definition.

Nor does Greathouse qualify as an individual with a disability under the second prong, which requires a record of an impairment that substantially limits one or more major life activities. *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002). None of Greathouse's illnesses currently causes substantial impairment to a major life activity, as we have shown, and he has not supplied any record proving he experienced such an impairment in the past.

Greathouse's efforts to satisfy the third prong also fall short. To prove that he is regarded as disabled, Greathouse must show that either "(1) a covered entity mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities, or (2) a covered

entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489; *see also Mahon*, 295 F.3d at 592.

Construing the facts in a light most favorable to Greathouse, we have found nothing in the voluminous record—nor has he pointed to anything in that record—indicating that the Corps regarded him as disabled. Although two of Greathouse's superiors knew that he had been suffering from depression, both say that they did not consider him to be disabled. And the lockmaster who chose Perdue over Greathouse for the Green River position said that he did not know Greathouse was depressed and that he had "[n]o knowledge either way" when asked whether he knew that Greathouse was under a doctor's care at the time of the hiring decision. JA 2359. That two supervisors were aware of one or more of Greathouse's ailments does not lead to the conclusion that the Corps regarded him as disabled. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (finding employer's knowledge of plaintiff's health problems and their impact on her job performance insufficient to establish that employer regarded plaintiff as disabled).

Greathouse persists that his illnesses significantly restricted his ability to perform a class of jobs—namely, "jobs on the locks with the United States Army Corps of Engineers." Br. at 15. Not only does he fail to provide evidence to support this statement, but his work history also directly contradicts the point. One of Greathouse's disability claims, indeed, is premised in large part on the fact that he was able, but denied the opportunity, to perform the Green River job—indisputably a "job on the locks with the Corps." He successfully carried out his duties at McAlpine, another Corps lock-and-dam job. And in turning down the Markland position, yet another lock-and-dam job, he

never indicated that his illnesses restricted him from taking the job. The only job from which Greathouse's ailments may have precluded him from working is the job with Stewart, but an inability to work with a fellow employee does not establish a disability.

Greathouse also contends that the Corps must have regarded him as disabled because it used the word "accommodation" in a Corps document. In a letter proposing that Greathouse be removed from his position (a recommendation the Corps ultimately rejected), the Project Manager noted that, "[i]n an attempt to resolve the issue" with Greathouse and Stewart, the Corps "made all reasonable accommodations possible." JA 1319. Greathouse argues that this sentence confirms that the Corps regarded him as disabled because "[a]ccommodation is the term used in relation to handicap or disability." Br. at 16. But the fact that the Corps scheduled Greathouse and Stewart for separate shifts, or gave Greathouse the option of working where Stewart was not, does not prove that it viewed Greathouse as disabled. An agency may make a work "accommodation" to an employee for a variety of reasons, most of them having nothing to do with whether it regards the individual as having a disability.

Greathouse next argues that he is disabled, or was regarded as disabled, because the federal government approved his application for disability retirement benefits. But this contention overlooks the difference between the two definitions of disability. A civil service employee becomes disabled for purposes of receiving retirement benefits if, "because of disease or injury," the employee is "unable . . . to render useful and efficient service in the employee's position and is not qualified for reassignment . . . to a vacant position which is in the agency at the same grade or level and in which

the employee would be able to render useful and efficient service." 5 U.S.C. § 8337(a). While the retirement-benefits statute requires only that the employee be unable to perform his own job or a vacant position of the same grade within the same agency, the Rehabilitation Act demands that the employee be unable to work in a broad range of jobs, not just his current job or its equivalent—and not just jobs at the employee's current place of employment.

## III.

To the extent Greathouse means to argue on appeal that his reassignment to McAlpine constituted a constructive discharge from the Corps (a point in doubt given his decision to make a one-sentence argument about it in his brief), his argument lacks merit. Having already concluded as a matter of law that Greathouse did not have a cognizable disability, we must necessarily conclude that the Corps' decision to reassign him to McAlpine did not amount to discrimination based on disability, much less a constructive discharge. The district court correctly granted summary judgment to the Corps on this claim.

## IV.

Greathouse lastly argues that the Corps retaliated against him because of his EEOC complaints. "A prima facie case of retaliation has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse

employment action are causally connected." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

The three adverse employment actions against him, Greathouse says, were the Corps' refusal to select him for the Green River job, its reassignment of him to McAlpine and its threat of termination. Greathouse, for one, cannot sustain this claim based on the fact that he was not chosen for the Green River position. To constitute retaliation, quite sensibly, the adverse action must occur *after* the employee engages in the protected activity. The Corps, however, declined to hire Greathouse for the job *before* he filed his first informal EEOC complaint. The Corps could not retaliate against Greathouse, as the district court correctly concluded, for conduct that had yet to occur.

Nor does Greathouse offer evidence of a plausible causal connection between his EEOC activity and the reassignment to McAlpine. He simply offers no evidentiary explanation as to how his EEOC complaints had any cause and effect with respect to this reassignment.

Greathouse likewise never identifies the precise "threat of termination" that constituted an adverse employment action, leaving us to guess that he is referring to the Corps' proposed removal of him from the Cannelton job. As apparent evidence of a link between his discrimination complaints and the threat, Greathouse vaguely refers to "the document," the "testimony of Agency witnesses" and an "effect[ive]" admission by the Corps "in the administrative record." Br. at 22. Yet Greathouse never directs us to any specific document, witness statement or admission in this

2627-page record that would raise a genuine issue of material fact as to whether a causal connection exists. And we have not found such a document, statement or admission ourselves. Without "evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action," Greathouse cannot show that filing his discrimination complaints sparked the Corps to threaten to fire him. *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (internal quotation marks omitted).

V.

For these reasons, we affirm.