**Alvin EMORY, Appellant**

v.

**ASTRAZENECA
PHARMACEUTICALS LP.**

No. 03–4751.

United States Court of Appeals,
Third Circuit.

Argued Nov. 29, 2004.

Filed March 11, 2005.

Barbara H. Stratton (Argued), Knepper & Stratton, Wilmington, Delaware, for Appellant.

Susan R. Oxford (Argued), Equal Employment Opportunity Commission, Washington, D.C., for the Amicus—Appellant.

Edward S. Mazurek (Argued), Kevin A. Ormerod, Philadelphia, Pennsylvania, for Appellee.

Before RENDELL, ALDISERT, and MAGILL,* Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Alvin "Rob" Emory brought suit against his longtime employer, AstraZeneca Pharmaceuticals LP ("AstraZeneca"), alleging disability discrimination in the form of failure to promote and failure to provide reasonable accommodations in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Moving for summary judgment, AstraZeneca urged that Emory's substantive claims of discrimination need not be addressed because Emory, as a threshold matter, was not "disabled" under the ADA. The District Court agreed and granted AstraZeneca's motion on that basis. We disagree. Because a proper analysis of Emory's claims shows that he has established, at the very least, a genuine issue of fact as to his impairments' substantially limiting effect on his ability to perform manual tasks and learn, we will reverse and remand the District Court's grant of summary judgment in favor of AstraZeneca.

## I. BACKGROUND

### A. Facts

Emory, who was born with cerebral palsy, has worked as a custodian at AstraZeneca (and its predecessor companies) for more than 27 years. He is the only employee at the Newark, Delaware plant, his assigned facility, who commenced working as a custodian and still holds that position more than 25 years later. During the course of his employment, Emory has applied for several permanent higher-paying jobs with AstraZeneca, but claims that, without accommodation, he "has not been qualified for any of them because of his physical and mental impairments." Appellant's Brief at 12.

Among the physical impairments Emory endures as a result of his cerebral palsy are permanent partial paralysis on his right side, and a right hand, arm and leg he describes as "deformed." Dr. Stephen Rodgers, M.D., a Board Certified Independent Medical Examiner and Occupational and Pain Management Specialist, recently evaluated Emory and found that "the percentages of permanent impairment are right upper extremity—50% [and] right lower extremity—25%." Rodgers Rep. of Mar. 9, 2003 at A865.

As a child, Emory was treated at the Crippled Children Program of the Alfred I. duPont Institute of the Nemours Foundation, where he received physical, occupational, and speech therapy. The records reflect that Emory used hand splints, as well as corrective shoes and braces throughout much of his childhood. As a schoolboy, his evaluating physician concluded that Emory "has difficulty with bilateral dressing skills such as lacing. On activities requiring unilateral skills, he is slow but can work independently. He is able to remove his clothing with a minimum of assistance but he is unable to put them on independently." Functional Eval. at A1028.

---

* The Honorable Frank J. Magill, Senior Judge, U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

Though cerebral palsy left Emory with some use of his right side, he cannot lift anything heavy, or open and close his right thumb, which interferes with activities that involve the use of both hands as well those requiring right-handed gripping or dexterity. As a result, Emory cannot tie his shoes or a tie, roll his sleeves, close buttons, or put on a belt. In addition, among other tasks, he is unable to cut his fingernails or toenails, screw the top on a toothpaste tube, cut his own meat, open a jar, pull heavy dishes and pans in or out of the oven, change diapers, carry his children up the stairs, hold a pen or pencil in his right hand, or perform certain basic household chores and repairs.

To deal with the effects of these limitations, Emory continued to receive treatment at Nemours into adulthood, where he often discussed his employment and the obstacles faced there. For example, as memorialized by a therapist, he recounted his attempt at promotion in late 1983:

> Rob stated that he understood his limitations in his trunk, hip, and forearm rotation were responsible for the difficulties he was experiencing at his last attempt at job promotion. He knew he could not do the work, but had refused to give up during the trial period (he spent five days training for a new position but was denied the job). He said he fatigued considerably during each two hours of continuous lifting and rotating, resulting in decreased coordination, slowness, carelessness, forgetfulness, tripping, and fine motor incoordination.

duPont 12/1/83 Eval. at A1034. The therapist concluded that "[i]t was clear that his difficulty was with shoulder, forearm and wrist rotations as well as trunk and hip rotations which were impairing his ability to perform the task at the speed required." *Id.* at A1035. In all, Emory bid unsuccessfully for approximately ten internal promotions over a 12–year period.[1] In many instances, his unaccommodated physical inabilities and limitations rendered him incapable of performing the jobs he sought.

In addition to these physical inabilities, Emory also experiences mental limitations stemming from his cerebral palsy. As a result, he was placed in Special Education classes from an early age. He ultimately obtained a diploma from this track; though, as a tenth grade student, Emory's word recognition and math skills were at a second grade level. In 1972, also while a tenth grader, Emory registered a Full Scale I.Q. score of 72; in 1994, he registered a score of 86; and most recently, in 2003, Emory scored a Full Scale I.Q. of 77, placing him in the borderline range of intellectual performance and in the 6th percentile of the general population. On a 2003 Hopkins Verbal Learning Test, Emory showed a deficient learning curve. Additional tests administered in 2003 revealed that in reading, arithmetic and spelling, Emory tested at or below 99 out of 100 adults in his age group. *Id.* at 878.

As have his physical impairments, Emory claims that such mental limitations have hindered his advancement at AstraZeneca. Rather than reading test questions for himself, he needs to have the questions read aloud for him. Even verbal instruc-

---

1.   In some instances Emory undertook to train for a new position, but never actually had the opportunity to assume the job. For example, with respect to the Material Inspector job (1988), Emory's personnel records recount a meeting between Emory and Human Resources Director Jay Hampel during which Emory discussed freely certain difficulties he was facing training for his new position. According to Mr. Hampel, "Because of this, Rob and I concluded that it would be best to discontinue training." Personnel File Aug. 15, 1988 at A1110.

tions often leave Emory confused. His quest to attain a Mechanic position at AstraZeneca is illustrative. In 1985, Emory first sought a Mechanic position but was unable to pass the required Bennett Mechanical Comprehensive test. He failed not only that year, but time and again—in 1986, 1987, 1998, and 1999. Mechanic Test Scores at A1149. In 1995, a doctor on Emory's behalf requested that he receive tutoring for the exam, that the exam be taken orally and extra time allotted. AstraZeneca complied with only the second request to take the exam out loud. But even with oral recitation of the questions, Emory again failed.

Emory cannot learn new skills from a training manual, rather, he must learn via a "hands-on" or combination visual and verbal approach, but still at a pace substantially slower than his colleagues. As observed of Emory by an occupational therapist at the Nemours Foundation:

> Visual figure ground is moderately to severely impaired; praxis (motor planning), math computations, size and number estimations (*e.g.*, he cannot determine if 25 bottles of a certain size fit into a specific box even after repeated trials), reading skills, visual memory, and auditory processing also seem below expectations, Rob frequently does not hear what is being said to him; several times he began speaking before the therapist finished talking and then did not respond to questions asked.

duPont 8/23/83 Eval. at A1043. Therefore, even a combined verbal and "hands-on" approach does not guarantee Emory a successful learning experience.

Notwithstanding the frequent professional frustrations wrought by his limitations, Emory has, since adolescence, consistently endeavored to challenge himself and to participate in various civic and community activities. Though he could not lift a gurney, climb a ladder to rescue someone, operate a fire hose without assistance, or "mask-up" on his own, Emory became a volunteer firefighter as a teenager. He explained that the fire company "didn't want to see a person that was willing to try fail. And they let me do what I was capable of doing. Then I would ask for extra help as I needed." Emory Dep. at A163–A164. Emory also joined the Shriners but, physically limited in his ability to march in sync with other members, instead developed a character incorporating his own impairments known as "Stumbles the Clown" who performs with the Shriners' Circus.

As an adult, Emory has volunteered to join a team responsible for mediating local disputes at the Center for Justice in Wilmington, Delaware; he described the disputes as concerning "family, friends ... [and] neighbors." *Id.* at A193. And, most recently, Emory, who was hired to perform part-time cleaning work for the Newark Temple, formed "Rob's Cleaning Service." He and his partner share cleaning duties and, besides the temple, have one other contract.

Despite undertaking various other commitments, Emory remained undeterred in his pursuit to advance at AstraZeneca. After numerous failed attempts at advancement, in 1999, he assumed a temporary role as acting Second Shift Supervisor following the promotion of another employee. That assignment lasted almost two years—Emory claims that, during that two year period, he was frequently criticized for math errors, spelling and grammar mistakes, and the length of time it took him to complete administrative tasks. When he asked his supervisors if he could use a calculator to add and subtract overtime and work hours (and offered to buy it himself), he was refused on the ground that it would embarrass him "because ev-

eryone should know basic subtraction and adding." Emory Dep. at A232. One of these same supervisors routinely referred to Emory as "Rainman" in reference to the autistic character in the movie by the same name.

Yet still, in an effort to improve his performance in the Second Shift Supervisor position, Emory approached HR Director Hampel and asked for an assessment at Sylvan Learning Center. He was refused. He later asked for and received from AstraZeneca a block of time for Easter Seals computer training. His instructor at Easter Seals, Phyllis Gourdin, issued a report to AstraZeneca with recommendations that voice-activated software be installed on Emory's computer and that additional instruction on grammar, spelling and writing be afforded. No action was taken on these recommendations. Following a reorganization of the Maintenance Department in 2001, Emory, who believed he was the "heir-apparent" to the job after having performed it for close to two years, was passed over for the permanent Second Shift Supervisor position.

Emory filed a joint Charge of Discrimination with the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the ADA and Delaware Handicapped Persons Act, 19 Del.C. § 720 *et seq.* The DDOL investigated the charge and found that Emory was a qualified individual with a disability under both federal and state law. Emory later filed a complaint in the District Court alleging discrimination in the form of failure to promote and failure to provide reasonable accommodations; he claimed that he was disabled under the meaning of the ADA because his impairment(s) have substantially limited him in the major life activities of walking, learning, and performing manual tasks.[2]

## B. District Court Proceedings

In the District Court, AstraZeneca sought summary judgment against Emory. Though AstraZeneca had not contested Emory's status as a qualified individual with a disability before the DDOL, AstraZeneca took the position before the District Court that Emory's limitations were not substantially limiting so as to render him "disabled" under the ADA. AstraZeneca denied that Emory's evidence of impairment even presented a question for the jury.

The District Court determined, as a matter of law, that Emory was not "disabled" for purposes of the ADA and granted AstraZeneca summary judgment on this basis. Specifically, the Court found that the manifestations of Emory's cerebral palsy did not limit him in the major life activities of performing manual tasks or learning.[3] With respect to the performance of manual tasks, the District Court stated, "Although Mr. Emory has some limitations in his ability to grip, carry and manipulate objects and needs assistance in accomplishing some household chores, childcare duties, and activities involving his right side, his limitations are not substantial or severe." Dist. Ct. Op. at A9. The

---

**2.** As we discuss *infra* at footnote 6, Emory also claimed he could establish "disability" through his "record of impairment." 42 U.S.C. § 12102(2)(B).

**3.** The District Court also held that Emory was not substantially limited in the major life activity of walking, a conclusion which we will not disturb on appeal. *See Kelly v. Drexel University,* 94 F.3d 102, 108 (3d Cir.1996) (finding that plaintiff who fractured his hip, leaving him with a noticeable limp and who was diagnosed with severe post-traumatic degenerative joint disease of the right hip, was not substantially limited in life activity of walking).

court found significant evidence regarding Emory's civic endeavors—his ability to "perform as a clown, counsel families as a mediator, and assist his community as a firefighter." *Id.* It noted that "while he may perform some of his daily activities in an unconventional manner as a result of his impairments, he is not substantially limited in his ability to perform those activities." *Id.*

As to learning, the District Court noted that Emory does indeed have "learning impairments," *id.* at A10, and is "limited in his literacy and computational skills," *id.*, but determined that those impairments could not be considered substantially limiting, again, primarily because of the challenges Emory was courageous enough to undertake and, in some instances, overcome. "The record indicates that Mr. Emory graduated from high school and updated his computer skills through occupational training. Mr. Emory passed the certification requirements to become both a family mediator and a fireman, and he has consistently earned positive performance evaluations during his 26 years of employment with AstraZeneca." Dist. Ct. Op. at A10.

## II. ANALYSIS

### A. Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. § 1343, and we have jurisdiction under 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary, and we apply the same standard that the District Court should have applied. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir.2001). Summary judgment is appropriate when there are no genuine issues of material fact and, viewing the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Abramson*, 260 F.3d at 276.

### B. Applicable Law

The ADA prohibits discrimination against qualified individuals who suffer a "disability." The statute defines "disability," in part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). The parties here agree that cerebral palsy is an impairment. And, Emory has identified those major life activities in which he claims to be substantially limited, which include the performance of manual tasks and learning. AstraZeneca, however, denies that Emory's limitations are substantial.

Though "[s]ubstantially in the phrase substantially limits suggests considerable or to a large degree," *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), the Supreme Court has made clear that "[t]he Act addresses substantial limitations on major life activities, *not utter inabilities*," *Bragdon v. Abbott*, 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (emphasis added). *See also Fiscus v. Wal–Mart Stores, Inc.*, 385 F.3d 378 (3d Cir.2004) ("We also read the Supreme Court to hold that a substantial limitation of a major life activity does not mean impossibility or even great physical difficulty; rather, substantial limitation is weighed in a broad, practical sense."). When evaluating substantial limitation, courts must consider a plaintiff's ability to compensate for his disability through mitigating measures, *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565–67, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), but the essence of the inquiry regards comparing the

conditions, manner, or duration under which the average person in the general population can perform the major life activity at issue with those under which an impaired plaintiff must perform, *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir.1999).

The EEOC's interpretive guidelines[4] echo, and expound upon, these precepts:

(1) The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The EEOC guidelines further counsel that the following factors should be considered in determining whether an individual is substantially limited:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

It bears noting that the EEOC has filed a 31–page *amicus curiae* brief in this case imploring us to recognize that conscientious application of the law demands reversal of the District Court's conclusion that Emory has not adduced sufficient evidence to raise a genuine issue of fact regarding his status as "disabled" under the ADA.[5] We agree with the EEOC's contention that to affirm this conclusion in the face of ample evidence concerning the substantial impact Emory's impairments have on his ability to perform routine functions of daily life would deprive victims of the ability to challenge discriminatory acts, and thereby undermine the ADA's purpose. The statute was passed because Congress found "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous," 42 U.S.C. § 12101(a)(9), not in order to provide piecemeal protection to only those with the most tragic or obvious impairments.

## C. Discussion

### 1. Performing Manual Tasks

■ The District Court's focus on what Emory has managed to achieve misses the mark. While evidence of tasks he has mastered might seem to serve as a natural counterpoint when evaluating disability, the paramount inquiry remains—does Em-

---

4. We have, in the past, noted that "[b]ecause the ADA does not define many of the pertinent terms, we are guided by the Regulations issued by the Equal Employment Opportunity Commission to implement Title I of the Act." *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 143 n. 4 (3d Cir.1998) (en banc) (citing 42 U.S.C. § 12116 (requiring the EEOC to implement said Regulations)).

5. While the EEOC concludes by focusing on Emory's right to a jury determination, its brief is replete with categorical assertions that Emory is substantially limited in his ability to engage in various major life activities, thus rendering him "disabled" as a matter of law. The *amicus* brief contains myriad statements of fact and law demonstrating that the ADA's definition of "disability" must include Emory, who suffers obvious and severe restrictions, if it is to protect anyone at all.

ory "have an impairment that prevents or severely restricts [him] from doing activities that are of central importance to most people's daily lives"? *Toyota*, 534 U.S. at 197, 122 S.Ct. 681. If so, then he is substantially limited in the performance of manual tasks and has established disability under the ADA.

The record is replete with references to the severe restrictions imposed by Emory's impairments. Emory has been, since childhood, either unable to perform, or only able to perform with significant difficulty, a range of manual tasks central to daily life. Physically, Emory suffers from weakness and partial paralysis in his right arm. He lacks grip, strength and dexterity in his right hand which, as detailed by physicians and therapists, has seriously affected his ability to perform without accommodation manual tasks required for promotion at AstraZeneca. . As he cannot perform activities that require him to grasp and hold with two hands, he is also unable to perform a number of more personal manual tasks involving dressing, eating and maintaining. personal hygiene. These limitations have interfered with Emory's ability to care for his children and prevent him from performing many ordinary household tasks central to the lives of most people.

So, while the District Court stressed that Emory could "operate a cleaning business, perform as a clown, counsel families as a mediator, and assist his community as a firefighter," it ignored evidence that Emory cannot tie his shoes or necktie, open a jar, cut his nails, perform various household chores and repairs, remove heavy dishes from the oven, change a diaper, carry his children up the stairs, or cut his own meat with a knife and fork. These latter activities, which are but a few examples demonstrative of how very manually impaired Emory is, are "of central impor-

tance to people's daily lives," and Emory is either completely without ability or severely restricted in his ability to perform them.

The crux of the inquiry lies in comparing the way in which Emory is able to perform activities, if at all, with the way in which an average member of the general population performs the same activities. An average person, for example, thinks nothing of getting dressed, whether or not the task includes buttons, zippers, laces or sleeves. For Emory, the act of dressing presents huge hurdles, some of which he can overcome through accommodations or the help of another person, and many of which he cannot. "That [a plaintiff], through sheer force of will, learned accommodations, and careful planning, is able to perform a wide variety of activities despite his physical impairments does not mean that those activities are not substantially more difficult for him than they would be for an unimpaired individual." *Ordahl v. Forward Tech. Indus., Inc.*, 301 F.Supp.2d 1022, 1028–29 (D.Minn.2004). What a plaintiff confronts, not overcomes, is the measure of substantial limitation under the ADA.

Here too, AstraZeneca has offered evidence of Emory's force of will, perseverance, and some learned accommodations; however, the fact that Emory has been able to become a productive member of society by having a family, working, and serving his community does not negate the significant disability-related obstacles he has overcome to achieve, nor does it undermine his inability, or significantly restricted ability, to learn and perform numerous manual tasks of central importance to daily life.

Moreover, while it is the standard announced in *Toyota* and interpreted by the EEOC that drives our analysis of a plaintiff's claims under the ADA, the statute also requires that alleged disabilities be evaluated "with respect to an individual,"

42 U.S.C. § 12102(2). We are mindful of the extraordinarily fact-intensive nature of the inquiry; even if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways. Case law in this area is therefore useful primarily in setting helpful benchmarks by which a court can gauge the severity of a plaintiff's impairments. But where we have seen physical handicaps of the same nature as those suffered by Emory, courts have more often than not denied summary judgment. *See Gillen v. Fallon Ambulance Svc.,* 283 F.3d 11, 22 (1st Cir.2002) (reversing the district court's determination as a matter of law that the plaintiff EMT-applicant with one functioning arm, who demonstrated courage and perseverance, was not substantially limited in lifting); *Luttrell v. Certified Grocers Midwest, Inc.,* Civil Action No. 02–8881, 2003 WL 22844239, at *2, 2003 U.S. Dist. LEXIS 21520, at *7 (N.D.Ill. Dec. 1, 2003) (holding a genuine issue of material fact exists as to whether plaintiff with "mild" cerebral palsy resulting in deformed left hand is disabled under the ADA); *Ordahl,* 301 F.Supp.2d at 1028–29 (holding plaintiff, whose use of a prosthetic hand affected his ability to bathe, dress, eat, grasp, and perform actions requiring manual dexterity, had successfully made out prima facie case under the ADA).

A rational factfinder could reasonably conclude that, when compared to an average individual in the general population, Emory is substantially limited in his ability to perform manual tasks. Therefore, Emory has established a genuine issue of fact as to his entitlement to protection under the ADA.

### 2. Learning

The District Court concluded that Emory's "learning impairments" should not be considered substantially limiting because "the record indicates that Mr. Emory graduated from high school and updated his computer skills through occupational training, [passing] the certification requirements to become both a family mediator and a fireman, and ... consistently earn[ing] positive performance evaluations during his 26 years of employment with AstraZeneca." Dist. Ct. Op. at A10. However, again, "The key question is not whether a handicapped person accomplishes [his] goals, but whether [he] encounters significant handicap-related obstacles in doing so." *Gillen,* 283 F.3d at 22. Further, when compared to others, his learning impairments are clearly severe.

Emory presented evidence in the record that he completed high school, but on a special education track; during his sophomore year of high school he was reading at a second-grade level. He has had his I.Q. tested three times, with the highest score registering in the mid-eighties (the two other scored registered in the seventies), falling into the borderline range of intellectual functioning. Emory's limitations interfere with his ability to read and process information, as well as basic math skills or the filling out of paperwork. Emory can complete exams only if given orally, and even then, requires additional time—this seems to be a result of both his own difficulty with reading and his inability to express himself in writing. Experience has proven that Emory is incapable of learning as do other employees, through manuals or brief instruction or training. Diagnostic tests administered over a span of years establish that Emory's math, reading and cognitive skills are far below those possessed by average persons in the general population—test results reveal poor calculation and computational abilities, literacy skills which place him in the

bottom of the first percentile according to one test, and a deficient learning curve.

These manifestations of Emory's mental impairment are significant. The "nature and severity," 29 C.F.R. § 1630.2(j)(2)(i), of Emory's learning impairments are such that he cannot intake or process basic information the way average individuals do, often unconsciously. And, the "expected duration" of these impairments is no less than "permanent." 29 C.F.R. § 1630.2(j)(2)(ii) & (iii). The fact that he is able, through an often laborious combination of non-traditional methodologies, to learn certain skills does not obscure the substantial limitations imposed by his impairments on his ability to learn. Indeed, it only highlights the fact that Emory is "[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner or duration under which the average .person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). Again, the Supreme Court has stressed that "[w]hen significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable." *Bragdon,* 524 U.S. at 641, 118 S.Ct. 2196. Mentally, Emory is unable to engage in the most basic and essential methods of learning—reading written materials and following oral instruction. At the very least Emory has adduced evidence sufficient to create a genuine issue of fact as to whether he is substantially limited, as compared to an average member of the population, in the major life activity of learning. *See Farrington v. Bath Iron Works Corp.,* Civil Action No. 01–274, 2003 WL 278172, at *11, 2003 U.S. Dist. LEXIS 1938, at *38 (D.Me. Feb..7, 2003) (holding employer not entitled to summary judgment because evidence that employee tested in the 5th to 10th percentile for reading skills, displayed a preference for simple, repetitive jobs, and had great difficulty learning certain tasks, was sufficient to raise question of fact as to his substantially limited ability to learn).

### III. CONCLUSION

When evaluating claims brought under the ADA, "the focus is not on whether the individual has the courage to participate in the major life activity despite [his] impairment, but, rather, on whether [he] faces significant obstacles when [he] does so." *Gillen,* 283 F.3d at 22. Without question, Rob Emory has proffered ample evidence as to the barriers erected by his impairments. Under both the EEOC guidelines and the Supreme Court's articulation of "substantial limitation" in *Toyota,* Emory has created a genuine issue of fact as to whether he is disabled in the major life activities of performing manual tasks and learning.[6]

The order of the District Court will be reversed .and remanded for further proceedings consistent with this opinion.

---

**6.** Because we conclude that Emory, based on his presentation of evidence that he is substantially limited in performing manual tasks and learning, is entitled to have a jury apply the relevant law and determine his "disability" status under the ADA, we need not address Emory's contention that he can establish "disability" through a "record of impairment." 42 U.S.C. § 12102(2)(B).