

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-11-2006

# Weisberg v. Riverside Twp Bd Ed

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4533

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Weisberg v. Riverside Twp Bd Ed" (2006). *2006 Decisions*. Paper 1126.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1126

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

NO. 04-4533

CHARLES WEISBERG; GAIL WEISBERG

v.

RIVERSIDE TOWNSHIP BOARD OF EDUCATION;
J. ALAN FERNER; JODI LENNON, j/s/a

Charles Weisberg,
Appellant

On Appeal From the United States
District Court
For the District of New Jersey
(D.C. Civil Action No. 01-cv-00758)
District Judge:  Hon. Robert B. Kugler

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 24, 2006

BEFORE:  FUENTES, STAPLETON and ALARCON,*
Circuit Judges

(Filed: May 11, 2006)

* Hon. Arthur L. Alarcon, Senior United States Circuit Judge for the Ninth Circuit, sitting
by designation.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

I.

Appellant Charles Weisberg ("Weisberg") filed this suit against the Riverside Township Board of Education, the former Superintendent of Schools for the Riverside School District, J. Alan Ferner ("Ferner"), and the Business Administrator of the School District, Jodi Lennon. He alleged that the defendants violated the ADA by failing to provide "reasonable accommodations" for his alleged disability and that the defendants unlawfully disclosed his medical information in violation of his constitutional right to privacy.

The defendants moved for summary judgment and the District Court granted their motion. With respect to Weisberg's ADA claim, the District Court ruled that Weisberg was not "disabled" under the ADA and therefore not entitled to the Act's protections. The Court ruled that Weisberg was not substantially limited in the major life activities of learning and working. The Court noted that Weisberg had presented evidence showing that his tested abilities in reading comprehension, mental speed, and error monitoring were below average. But the Court reasoned that merely being "below average" could not entitle one to the ADA's protections because that would imply that roughly half the

population of the United States was "disabled" and Congress had estimated that only 43,000,000 Americans suffered from one or more physical or mental disability.

The District Court emphasized that merely having an impairment does not determine "disability" status under the ADA, and that the inquiry encompasses the impairment's impact on the life of the individual. The District Court reviewed the evidence showing the many activities Weisberg is capable of doing:

> Weisberg has acknowledged that he has been able to do his job and to do it well. He is able to work forty hours per week. He attends Monday night football games at Giants Stadium, eats out an average of three nights per week, and enjoys various activities in Atlantic City casinos.

App. at 31. In light of Weisberg's affirmative capabilities, the District Court reasoned that while a reasonable jury could find that Weisberg has an impairment, a reasonable jury, viewing the evidence in the light most favorable to Weisberg, "could not find that he is substantially limited in any major life activities, and therefore could not find that Weisberg has a disability under the meaning of the ADA." *Id.* Accordingly, the District Court did not reach the question of whether Weisberg had suffered an adverse employment decision, or whether Weisberg's claim was time-barred, as the defendants had argued.

With respect to the two privacy violations Weisberg raises on appeal, the District Court ruled that the defendants had not violated Weisberg's constitutional rights. It ruled that because an action under § 1983 cannot be based on negligent conduct of state actors, Weisberg's claim stemming from the accidental placement of his accident report in an

envelope given to another teacher must fail. As for a joke about Weisberg's CAT scan, the District Court characterized it as a "minor annoyance" that cannot support a federal case. *Id.* at 33 (quoting *Doe v. SEPTA*, 72 F.3d 1133, 1137 (3d Cir. 1995)).

This appeal followed. We will affirm essentially for the reasons given by the District Court.

II.

Weisberg is the Director of the Riverside School District Child Study Team. He is responsible for overseeing the evaluation and placement of special education students. As the Director of the Child Study Team, he oversees and evaluates staff members. In addition, he manages the District's grant applications and ensures compliance with state and federal rules pertaining to special education.

In June 1998, Weisberg was injured while sitting at his desk at work. A large wooden speaker fell off the wall behind him and struck him on the head, shoulder and back. He was subsequently diagnosed with "post concussive syndrome" or "concussive brain injury." App. at 78. Since the injury, Weisberg has suffered from fatigue and has had difficulty with his concentration and memory.

A number of physicians have examined and evaluated Weisberg since his injury. A report prepared by Dr. Rolland Parker summarizes those evaluations as finding, *inter alia*, that Weisberg:

- suffers from stress, anxiety and depression that adversely affect attention, concentration, and speed.

- has suffered from "profound, incapacitating fatigue since the accident" that "markedly interferes in his ability to function" and stems from his depression.

- scores highly on intelligence tests, but lower on measures of attention and concentration, reading comprehension, and working memory.

- is slow to carry out many tasks, even those he is able to perform well.

- suffers from headaches, poor memory and irritability.

In addition, an unsworn e-mail from Weisberg's wife to Dr. Parker indicates that reading has become tedious for Weisberg, that he has become very forgetful, irritable and argumentative, that Weisberg sleeps 16 hours or more at least one day a week, and that he is generally fatigued and lethargic.

At work, Weisberg has difficulty writing reports and feels like it now takes longer to do than before his injury. He also loses track of appointments. He is frequently late, which he attributes to his fatigue, and he is often absent or leaves work early in order to attend physician appointments. His fatigue prevents him from working longer than an eight-hour day, or if he does work longer than eight-hour days, he is unable to work all five days in a week. Despite these difficulties at work, Weisberg testified that he is able to do his job well.

In June 1998, Weisberg filed an employee incident report with the School District that contained information regarding the nature and extent of his injury. The report was accidentally stuffed into an envelope with another teacher's contract. Weisberg does not believe "by any stretch of the imagination" that the report was intentionally placed in the

other teacher's envelope, and agrees that it was done by accident. App. at 124.

On a separate occasion, Weisberg walked into a meeting that was underway to find the group of teachers laughing. Ferner explained that he had just joked to the group that "they had gotten the results of [Weisberg's] CAT Scan, and as we all knew, there was nothing there." Def. App. at 121. Weisberg did not understand the comment as a joke because his condition was "serious stuff" to him, and he viewed the comment as ridicule. Moreover, he was upset that Ferner had access to information regarding his CAT scan.

Weisberg is a New York Giants football fan. Despite his fatigue and other ailments, Weisberg was able to attend nearly all of the Giants' home games. A surveillance tape shows Weisberg attending one such game and returning home at 1:53 a.m., even though Weisberg denied under oath that he attended the game.

Weisberg and his wife eat out roughly three nights a week, less often than they previously ate out. Weisberg also enjoys following his investments in the stock market and playing certain games in Atlantic City casinos.

### III.

Under the ADA, employers are prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999). The statute defines "disability," in part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A); *see also Emory v. Astrazeneca Pharma. LP*, 401 F.3d 174, 179 (3d Cir.

6

2005).  The parties seem to agree that "post concussion sydrome" is an impairment within the meaning of the ADA, but disagree over whether that impairment substantially limits one or more of Weisberg's major life activities.

"The question of whether an individual is substantially limited in a major life activity is a question of fact."  *Williams v. Philadelphia Housing Authority Police Dep't*, 380 F.3d 751, 763 (3d Cir. 2004).  "'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree,'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002), but the ADA addresses limitations, "not utter inabilities." *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998); *see also Emory*, 401 F.3d at 179 (discussing "substantially limits" language of ADA).  The EEOC's interpretive regulations define "substantially limits" to mean:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  In addition, the regulations specify that the following factors should be considered in determining whether an individual is substantially limited in a major life activity:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long

7

term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).  The Supreme Court has explained that:

> It is insufficient for individuals attempting to prove disability status under
> this test to merely submit evidence of a medical diagnosis of an impairment.  Instead, the ADA re
> a disability by offering evidence that the extent of the limitation [caused by their
> impairment] in terms of their own experience. . . is substantial."

*Toyota*, 534 U.S. at 198 (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567

(1999)).  Courts must consider "a plaintiff's ability to compensate for his disability

through mitigating measures, but the essence of the inquiry regards comparing the

conditions, manner, or duration under which the average person in the general population

can perform the major life activity at issue with those under which an impaired plaintiff

must perform."  *Emory*, 401 F.3d at 179-80 (citations omitted).

In evaluating a plaintiff's limitations, focusing on what the plaintiff "has managed

to achieve misses the mark."  *Id.* at 180.  While evidence of tasks the plaintiff can

successfully perform "might seem to serve as a natural counterpoint when evaluating

disability, the paramount inquiry remains–does [the plaintiff] 'have an impairment that

prevents or severely restricts [him] from doing activities that are of central importance to

most people's daily lives'?"  *Id.* at 180-81 (quoting *Toyota*, 534 U.S. at 197).  "What a

plaintiff confronts, not overcomes, is the measure of substantial limitation under the

ADA."  *Id.* at 181.

Weisberg argues that he is "disabled" under the ADA because he is substantially

limited in at least one major life activity, although he is somewhat unclear about in which

8

major life activities he claims substantial limitation. We read Weisberg's brief as arguing that he is substantially limited in three major life activities: 1) cognitive function (*i.e.,* learning, concentrating, and remembering); 2) performing manual tasks; and 3) working.[1]

A. Cognitive Function

Learning, concentrating and remembering fall into the general category of cognitive function. This court has held such activities to be major life activities. *See Gagliardo v. Connaught Laboratories, Inc.*, 311 F.3d 565 (3d Cir. 2002) (concentrating and remembering "(more generally, cognitive function)" are major life activities); *Taylor*, 184 F.3d at 307 ("We accept that thinking is a major life activity."); *Emory*, 401 F.3d at 183 (accepting learning as major life activity).

Weisberg argues that he is substantially limited in his cognitive function. The physician report primarily relied on by Weisberg shows: 1) that his short term/working memory is "reduced" or "less than expected;" 2) that his reading comprehension ranks in the 25th percentile "using the norms for 18 year olds" and that "this is evidence for a considerable reduction of academic and vocational skills;" 3) his mental speed ranks in the 27th percentile and his response time is "marginally slow;" 4) his accuracy on a test of labeling the environment was "poor," *i.e.*, while the population's average score is around

---

[1] Weisberg also makes occasional reference to limitations in the major life activity of "caring for one's self." *See* R. Br. Appellant at 9. However, the only relevant evidence offered in support of such a limitation appears to be evidence suggesting that he has difficulty remembering to take his medicine regularly. We view this limitation as subsumed by the more general limitation in cognitive function.

85 percent, Weisberg's was only 76 percent; and 5) that the accident had a significant

"deleterious effect," but not "impairing," on Weisberg's ability to perceive and respond to

unfamiliar situations.  In addition, the report shows that Weisberg is clinically depressed,

experiences anxiety, and seems to have lost a sense of direction.  Evidence in the record

suggests that these limitations interfere with Weisberg's ability to read for pleasure, keep

track of appointments, remember peoples' names, and remember to regularly take his

medicine.  However, other evidence in the record paints a more positive picture of

Weisberg's overall intellectual functioning.  *See* Pl. App. at 54 (report of Kathy A.

Lawler, D. Phil.) (noting that Weisberg scored in "Superior" range for Verbal and Full

Scale IQ, in the "Very Superior" range for perceptual organization, but only in the

"Average" range for working memory).

The evidence in the record shows at most that Weisberg is impaired by his post-

concussion syndrome such that he falls in the bottom quartile[2] of the country on certain

measures of cognitive function, but ranks highly or in the average range on other

measures.  "'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or

---

[2]The parties dispute the relevance of the fact that Weisberg's ranking in reading comprehension was stated relative to the norms of 18 year-olds.  *See* Br. Appellant at 18; Br. Appellee at 19 n.1;  R. Br. Appellant at 5-6.  Nothing in the record suggests that norms of 18 year olds differ from the norms for the adult population as a whole and it is Weisberg's burden to show that he is "disabled" under the ADA.  Weisberg argues that the "figures must be adjusted for someone of Mr. Weisberg['s] age, education and experience," but the regulations specify that the relevant comparison is to the "average person in the general population," 29 C.F.R. § 1630.2(j)(1), not to the average person of similar age, education and experience.

'to a large degree.'" *Toyota*, 534 U.S. at 197 (2002). One must be "substantially" limited "as compared to . . . the average person in the general population." 29 C.F.R. § 1630.2(j)(1). It is clear from the undisputed evidence that the overall picture of Weisberg's cognitive function, as measured by tests, is that he is someone of high intellectual capacity, with only certain narrow and relatively minor limitations.

Moreover, "the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] *in terms of their own experience* . . . is substantial." *Toyota*, 534 U.S. at 198 (quoting *Albertson's*, 527 U.S. at 567) (emphasis added). Weisberg testified to the real world consequences of his memory problems. With "out of the ordinary" frequency, people say things that he does not later remember their having said, or he asks his wife a question that he has already asked of her. Def. App. at 116. Similarly, he sometimes forgets that he is "supposed to be somewhere at a specific time," or that he has "to do something" until somebody either reminds him or he notices that he has written it down. *Id.* He has "to use compensatory type things," like keeping more records or having his secretary remind him, to make sure that he remembers to do things. Common experience tells us that these are not unusually restrictive limitations on cognitive function such that they amount to a "substantial limitation" indicating that Weisberg is "severely restricted" in this regard.

Finally, Weisberg has addressed only the nature and severity of his impairment, which is only one of the three factors that the regulations specify should be considered in

11

determining whether an individual is substantially limited in a major life activity. He presents no evidence pertinent to the "duration or expected duration of the impairment" or the "expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(ii)-(iii). Accordingly, with respect to the major life activity of cognitive function, Weisberg has failed to meet his burden of establishing a *prima facie* case by showing that he is "disabled" under the ADA.

B. Performing Manual Tasks

Weisberg also argues that he is substantially limited in his ability to perform manual tasks. The regulations specifically list "performing manual tasks" as a "major life activity" and our court has accepted it as such. *See Emory*, 401 F.3d at 180-82. Weisberg argues primarily that fatigue stemming from his post-concussion syndrome and associated depression prevent him from "climbing a ladder without help . . . , do[ing] yard work and household chores or even play[ing] tennis like he did at one time." Br. Appellant at 19. He does not cite to particular aspects of the record in this regard. He appears to be referring to Dr. Parker's reporting of Weisberg's statement that he "can't climb up a ladder and his wife cleans the leaves out of the gutter of the ranch house." Pl. App. at 72. Even accepting that due to persistent fatigue, he is unable to climb ladders, or do chores and play tennis "like he did at one time," these are narrow and minimal limitations on Weisberg's ability to perform manual tasks.

C. Working

The regulations list "working" as a major life activity and we have treated it as

12

such. *Williams v. Philadelphia Housing Auth.*, 380 F.3d 751, 762-63 (3d Cir. 2004) (accepting working as major life activity); *but see Sutton*, 527 U.S. at 492 (assuming without deciding that working can be major life activity and noting conceptual difficulties associated with treating working as major life activity). The "regulations provide that one is substantially limited in the major life activity of working if one is significantly restricted in one's ability to perform '*either* a class of jobs *or* a broad range of jobs.'" *Williams*, 380 F.3d at 763 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). One may be significantly restricted in one's ability to perform a *class* of jobs "if one is significantly restricted in one's ability to perform most of the jobs in one's geographical area that utilize training, knowledge, skills and abilities similar to the job one has been disqualified from performing." *Id.*

Weisberg argues that his persistent fatigue and cognitive function impairments have substantially limited him in the major life activity of working. He points to evidence showing that he "felt that [writing reports at work] was taking him much longer than it had before." App. at 49. Weisberg also has difficulty remembering his appointments, but has compensated through use of a computer scheduling program and by having his secretaries remind him of appointments. He is frequently late, which he attributes to his fatigue, and he is often absent or leaves work early in order to attend physician appointments. His fatigue prevents him from working longer than an eight-hour day, or if

13

he does work longer than eight-hour days, he is unable to work all five days in a week.[3]

Importantly, Weisberg makes no attempt to show that these difficulties significantly restrict his ability to perform a broad range or class of jobs. Weisberg makes reference to Dr. Parker's statement, made in reference to Weisberg's 25th percentile score in reading comprehension, that:

> Considering his education and occupation, this is evidence for a considerable reduction of academic and vocational skills that create a problem in daily processing of information necessary for his job. It would also create a problem in re-training for another skilled white collar position.

App. at 72; *see* R. Br. Appellant at 8-9. But a mere "problem," presumably applicable to 25 percent of the adult population, cannot amount to a disability under the ADA. Moreover, the difficulties Weisberg points to do not amount to "significant restrictions." While Weisberg suffers from fatigue, he admits that he is fully capable of working a forty-hour week. Further, Weisberg offers no reason to believe that because it now takes

---

[3]The defendants make much of Weisberg's testimony that despite these difficulties at work, he is able to do his job well. But optimistic self-assessments should be given little weight in the ADA context. See Gillen v. Fallon Ambulance Service, 283 F.3d 11, 22 (1st Cir. 2002) (plaintiff's optimistic self-assessment of capabilities deserves little weight and "was more a testament to her determination than to her condition"). At most, such assessments, if contradicted by evidence that a plaintiff actually is significantly restricted in his or her ability to perform a broad range or class of jobs, create an issue for the jury.

The District Court and the defendants also place substantial emphasis on the many things that Weisberg is able to accomplish (*i.e,* attending Giants games, eating dinner out late at night, etc.). A jury might well find these abilities relevant in assessing Weisberg's credibility, but, in general, focusing on what a plaintiff "has managed to achieve misses the mark." *Emory*, 401 F.3d at 180. "What a plaintiff confronts, not overcomes, is the measure of substantial limitation under the ADA." *Id.* at 181.

him somewhat longer to write reports at work than it did prior to the accident, that this slowness relative to his prior performance, not to the general population, would disqualify him from performing a broad range or class of jobs.

In sum, while Weisberg has produced evidence that he suffers from an impairment, he has not produced evidence from which a trier of fact could conclude that the impairment substantially limits him in the major life activities of cognitive function, performing manual tasks, or working. Accordingly, Weisberg is not "disabled" under the ADA and is not entitled to the Act's protections.

IV.

There are two main kinds of substantive privacy interests protected by the Due Process Clause of the Fourteenth Amendment. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). Weisberg argues that the District and its officials violated his privacy interest in avoiding disclosure of personal matters when a District official inadvertently placed Weisberg's employee incident report, which contained medical information, in an envelope given to another employee and when Ferner made a joke about Weisberg's CAT scan.

A. Inadvertent disclosure

"Medical information . . . is entitled to privacy protection against disclosure." *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 113 (3d Cir. 1987). However, "the Due Process Clause is simply not implicated by a *negligent* act

15

of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986). Because Weisberg does not dispute that the District employee accidentally included his incident report in the envelope given to another employee, Weisberg has no substantive due process claim for this disclosure.

Weisberg's argument that the District violated its "obligation to implement 'adequate safeguards to prevent unauthorized disclosure'" is misplaced. Br. Appellant at 26 (quoting *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir. 1980)). In *Westinghouse*, we considered the validity of a subpoena obtained by the National Institute for Occupational Safety and Health requiring disclosure of medical records from the employees of Westinghouse Electric. *Id.* at 573. In ruling that the subpoena did not violate the constitutionally protected privacy interests of Westinghouse employees, we weighed the competing factors, including such factors as

> the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, *the adequacy of safeguards to prevent unauthorized disclosure*, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Id.* at 578 (emphasis added). Thus, in considering whether an *intentional* disclosure of medical information unconstitutionally interfered with an individual's right to privacy, we considered "whether there are effective provisions for security of the information against *subsequent* unauthorized disclosure." *Id.* at 579 (emphasis added). The *Westinghouse* court did not suggest that an individual could support a substantive due process claim

16

under § 1983 based on inadvertent disclosure of his medical information, but only considered the possibility of subsequent inadvertent disclosure in evaluating the constitutional validity of an intentional disclosure. *Id.* at 579-80. Even if the *Westinghouse* court had suggested there could be a valid claim for accidental disclosure under § 1983, the decision would have been abrogated by the Supreme Court's subsequent decision in *Daniels.* 474 U.S. 327. Thus, Weisberg has no claim based on the undisputedly inadvertent disclosure of his employee incident report.

B. CAT scan joke

Superintendent Ferner joked to a group of employees that "they had gotten the results of [Weisberg's] CAT Scan, and as we all knew, there was nothing there." Def. App. at 121. The District Court dismissed Weisberg's claim stemming from this incident on the ground that "[m]inor annoyances do not make a federal case." App. at 33 (quoting *Doe v. SEPTA*, 72 F.3d 1133, 1137 (3d Cir. 1995)). We agree with the District Court that this joke does not rise to the level of a constitutional violation. Moreover, Ferner's comment did not reveal anything of substance about Weisberg or his medical condition, except for the fact that he had had a CAT scan performed. It goes without saying that no reasonable person could have taken Ferner's comment at face value to mean that the CAT scan showed Weisberg's head to be literally empty. As for the "disclosure" of the fact that Weisberg had received a CAT scan, no reasonable jury could conclude that this constituted the disclosure of confidential medical information when Weisberg has not suggested that the fact of his head injury itself was not known among the staff.

17

## V.

The judgment of the District Court will be affirmed.