Lisa Patrice GROSS, Plaintiff,

v.

GENERAL MOTORS CORPORATION,
Defendant.

No. 06–2452–JAR.

United States District Court,
D. Kansas.

Feb. 4, 2008.

Mark E. Meyer, Law Offices of Mark E. Meyer, LLC, Lee's Summit, MO, for Plaintiff.

David C. Vogel, Heather R. Gill, Lathrop & Gage, LC, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

JULIE A. ROBINSON, District Judge.

Plaintiff Lisa Patrice Gross brings this lawsuit against her former employer, General Motors Corp. ("GM"), alleging three claims: sexual harassment hostile work environment; retaliation under Title VII; and, discrimination under the Americans with Disabilities Act. The Court now considers defendant's Motion for Summary Judgment (Doc. 39). For the reasons set forth below, defendant's motion is granted in part and denied in part.

## I. BACKGROUND

The following facts are either uncontroverted, stipulated to, or taken in the light most favorable to plaintiff.[1] Plaintiff is an

---

1. Defendant moves for order to strike plain- tiff's statement of facts because plaintiff was

African–American female who began working for General Motors in February 2004. She joined the Auto Workers Union during her employment to take advantage of the collective bargaining agreement between GM and the Union. Section 111(b) of the bargaining agreement provides that employees have three days after the expiration of leave of absence to return to work. If an employee does not return to work within the specified time, she is considered to have voluntarily quit, in which case GM is required to send a letter notifying the employee that her "seniority has been broken" and that it may be reinstated if she returns to work within three days of receipt or delivery of the notification letter. Plaintiff was informed that her seniority was broken on January 9, 2006, and failed to respond to the notification letter. As a result, she was terminated.

The facts, though disjointed, are as follows. Throughout her employment with GM, plaintiff alleges that a number of employees and managers would ask her if she dated, to which she would tell them "no." In plaintiff's view, she was being asked these questions to "see if [she was] easy." Specifically, plaintiff identified Michael Carter as a supervisor who would routinely ask her about her dating habits. Plaintiff also recalls a situation in which Carter told her that he "took good care of his wife." This, Carter believed "kind of turned on ... a lot of women." Plaintiff also claims that Carter would comment on her body, including her "breast" and "butt." Plaintiff and Carter eventually became "good friends" and he stopped making remarks about her body and stopped inquiring into her dating habits.

Additionally, to support her hostile work environment claim, plaintiff, on November 11, 2005, found notes on a car in the parking lot. The notes were hand written and stated "Daddy can I have a pony for my b-day? Love me. Lisa, where is your daddy?" Plaintiff discovered more notes that evening, reported the notes to her supervisor, and requested to go to the labor relations department to discuss the notes. Her supervisor refused, but plaintiff left the assembly line, in violation of her supervisor's orders. After an investigation, the labor relations department learned that the notes were written by a female employee and left for a male employee. Plaintiff did not see any notes thereafter.

Plaintiff also suffered from depression and anxiety during her employment. She took her first medical leave on April 20, 2005 to June 21, 2005, for stress and depression. She took her second medical leave on August 9, 2005, to September 13, 2005. After returning to work, plaintiff was confronted in October by Michael Carter's wife. Mrs. Carter called plaintiff and accused her of having an affair with Carter. Plaintiff reported the phone call to Phil Johnson, GM's labor relations representative who, after speaking with Carter, scheduled a meeting with plaintiff to discuss the incident. Carter apologized and explained that he and his wife were going through a divorce, but that he would "handle it." Before leaving that day, plaintiff met Carter and apologized for reporting the incident, but Carter expressed that she had done the right thing. The two shared a hug and Carter left for the evening. Carter passed away on November 1 or 2, 2005.

Also in November 2005, plaintiff was diagnosed with bipolar disorder for which she took her third medical leave. She

late in filing her summary judgement response. The Court notes that deadlines are important and are in place for a reason. But, in light of the seriousness of striking plaintiff's statement of facts, the Court is of the view that plaintiff attorney's failure to meet the deadline, though unprofessional, should not result in the action requested by defendant.

underwent examination by Dr. Egea, an independent doctor, who concluded that plaintiff was functioning at 70%, which is characterized as a person with mild symptoms of social occupational functioning. Dr. Egea recommended that plaintiff return to work on January 9, 2006. Plaintiff also underwent examination by her own physician, Dr. Everson. During his discussions with plaintiff, Dr. Everson wrote on his medical reports that plaintiff complained about sexual harassment at work. On a note written on December 29, 2005, Dr. Everson noted that plaintiff should return to work on January 22, 2006.

Sometime in December 2005, while on leave, plaintiff attempted to enter the facility to view her medical records, but was escorted away because it is against GM policy for employees on leave to enter the facility. As a result of being ushered away, plaintiff contacted the labor relations department and scheduled a meeting with Ronald Metsdagh and Pamela Goodwin of GM on January 5, 2006. During that meeting, plaintiff noted that she was the subject of rumors that she and Carter were having an affair, and that Carter would routinely pat on his chest when he saw her because she made his heart flutter. She stated that she did not want to return to work on the night shift because the night shift was where more sexual harassment occurred. Additionally, it is noted in the record of the meeting that plaintiff told Metsdagh and Goodwin that Dr. Everson had extended her leave until January 22, 2006.

Defendant received a letter from plaintiff requesting accommodation for her bipolar disorder on December 29, 2005. The letter was attached to another from Dr. Everson explaining some of the accommodations plaintiff was requesting. The human resources department contacted plaintiff to schedule a meeting for January 20, 2006. Before the meeting, however, plaintiff's seniority was broken because she failed to return to the work on January 9, 2006, and the meeting was cancelled. On December 22, 2005, a letter was written by Dr. Everson stating that plaintiff had been failing to take her medicine as prescribed, and that she would be referred to another psychiatrist. On January 24, 2006, defendant received another letter from Dr. Everson explaining that plaintiff was discharged as his patient on January 1, 2006, and that the letter written on December 29, 2005 was issued prior to her discharge. The letter also stated that Dr. Everson would not validate any more disability time for plaintiff.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [2] A fact is only material under this standard if a dispute over it would affect the outcome of the suit. [3] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party." [4] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law." [5]

The moving party bears the initial burden of providing the court with the basis

---

**2.** Fed.R.Civ.P. 56(c).

**3.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**4.** *Id.*

**5.** *Id.* at 251–52, 106 S.Ct. 2505.

for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[6] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[7] The burden may be met by showing that there is no evidence to support the nonmoving party's case.[8] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9] When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[10] Furthermore, the record is to be viewed in the light most favorable to the nonmoving party.[11] Therefore, the Court will assume the nonmoving party's evidence to be true, determine all doubts in the nonmovant's favor, and draw all reasonable inferences in the nonmovant's favor.[12]

## III. ANALYSIS

### A. *Sexual Harassment—Hostile Work Environment*

GM contends that summary judgment should be granted on plaintiff's hostile work environment claim because: (1) plaintiff was not subject to a hostile work environment as the discrimination complained of was not so severe or pervasive as to alter a condition of plaintiff's employment; and, (2) GM adequately responded to plaintiff's complaints and therefore has an affirmative defense as explained in *Faragher v. City of Boca.*[13]

■■■ To state a claim for hostile work environment under Title VII, plaintiff must show that she was discriminated against because of her sex and that the discrimination was "sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment."[14] In other words, in order to survive summary judgment, plaintiff must show that a "rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."[15] A hostile working environment must be objectively and subjectively offensive—namely, one that a reasonable person would find offensive and one that the plaintiff did find offensive.[16] To determine whether an environment is hostile, the court must look at all the "circumstances including the fre-

**6.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**7.** *Thom v. Bristol–Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir.2003) (citing *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548).

**8.** *Id.*

**9.** *Id.*

**10.** *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**11.** *Harrison v. Wahatoyas, LLC,* 253 F.3d 552, 557 (10th Cir.2001).

**12.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**13.** 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

**14.** *Medina v. Income Support Div. of New Mexico,* 413 F.3d 1131, 1134 (10th Cir.2005).

**15.** *Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1219 (10th Cir.2003) (citing *Davis v. Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998)).

**16.** *Id.; see also Rogers v. City County Health Dep't of Oklahoma County,* 30 Fed.Appx. 883, 886 (10th Cir.2002).

quency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [17]

It is not contested that plaintiff subjectively perceived her work environment as offensive. She testified that other employees regularly asked her about her dating habits. In her deposition, plaintiff explains that other employees would talk and gossip about her habits, and that this type of thing occurred almost daily. She specifically remembered Mr. Carter asking her if she dated, which she perceived as him flirting. In her deposition, she testifies that Mr. Carter would explain how well he would treat her, but she ignored him. Ironically, plaintiff regarded Mr. Carter as a friend by the time he passed away. Additionally, there are notations on Dr. Everson's records that she complained of sexual harassment. As such, plaintiff subjectively believed that she was sexually harassed.

■ Plaintiff, however, has failed to provide this Court with sufficient evidence for a jury to conclude that her work environment was objectively hostile. Indeed, Courts in this Circuit have held that offensive language, jokes, gossip, and touching is not sufficiently severe or pervasive to render a hostile work environment.[18] Here, plaintiff has proffered evidence showing that fellow employees gossiped

about her and inquired regularly about her dating habits, none of which rises to the level of a working environment permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of her employment. Moreover, most of the evidence plaintiff provides is in the form of her general allegations.[19]

■ Even if the acts alleged rise to the level of a sexually hostile work environment, defendant has an affirmative defense because it responded in a timely and adequate manner to any complaints. There are two elements to the defense: that the employer acted with reasonable care to prevent and correct any sexual harassment, and plaintiff unreasonably failed to take advantage of preventative opportunities.[20] When plaintiff complained that Mr. Carter's wife accused her of having an affair with her husband, defendant quickly requested Mr. Carter to address the situation. Indeed, Mr. Carter apologized to plaintiff. Furthermore, when plaintiff complained about the notes she found, defendant conducted an investigation and concluded that the notes were not addressed to plaintiff. In fact, plaintiff did not receive any similar notes or phone calls after those two incidents. In her deposition, plaintiff admits that she did not report many of the incidents she claimed were abusive nor did she follow the proce-

---

17. *Stinnett,* 337 F.3d at 1219.

18. *Oliver v. Peter Kiewit & Sons/Guernsey Stone,* 106 Fed.Appx. 672, 674–75 (10th Cir. 2004); *see also Riske v. King Soopers,* 366 F.3d 1085, 1091 (10th Cir.2004) (plaintiff's complaints that manager followed her around the store and whistled at her did not rise to a sexually hostile work environment); *Pfahl v. Synthes,* 13 Fed.Appx. 832, 835 (10th Cir. 2001) (complaints that some employees made derogatory remarks about her, that another had hugged her, and candy wrappers had been left on her desk, taken as a whole did

not rise to a sexually hostile work environment).

19. *See Stinnett,* 337 F.3d at 1219 (allegations alone not sufficient); *see also Medina v. Income Support Div. of New Mexico,* 413 F.3d 1131, 1136–37 (10th Cir.2005) ("Without alleging specific instances of coworker harassment or describing them in any detail, no reasonable jury could find" for plaintiff).

20. *Faragher v. City of Boca,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

dure outlined by defendant for reporting her complaints. As such, defendant has established an affirmative defense to liability for plaintiff's hostile work environment claim. Therefore, summary judgment is granted on plaintiff's hostile work environment claim.

**B. *Title VII Retaliation***

■■■ A retaliation claim is analyzed under the burden shifting framework established in *McDonnell Douglas Corp. v. Green,*[21] where there is no direct evidence of retaliation.[22] Under that framework, plaintiff must first establish a prima facie case; the burden then shifts to the defendant to show that there was a legitimate nondiscriminatory reason for the adverse employment action.[23] If the defendant can provide a legitimate reason for the adverse action, the burden then shifts back to plaintiff to show that defendant's reason is pretext used to mask discriminatory animus.[24] Plaintiff can make a prima facie showing by producing evidence that she "(1) engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) a causal nexus exists between her opposition and the employer's adverse action."[25]

Plaintiff argues that there is an issue of material fact as to whether she suffered an adverse employment action when (1) she left the assembly line to report what she believed was sexual harassment and as a consequence was given a verbal reprimand on November 11, 2005, and (2) whether she was terminated for requesting accommodation for her alleged disability on January 4, 2006. The Court will discuss each incident in turn.

*1. Leaving the Assembly Line*

■■■ To make a prima facie showing of retaliation, plaintiff must show that she engaged in protected opposition to discrimination. While defendant concedes that leaving the assembly line to report finding the notes was protected activity, it maintains that plaintiff suffered no adverse action as a consequence. The Court agrees. In *Burlington Northern & Santa Fe Railway Co. v. White,*[26] the Supreme Court issued a new standard for determining whether an employer's action was adverse. To show that she suffered an adverse action, plaintiff must establish that a reasonable "employee would have found the challenged action materially adverse—that is, that the action might 'dissuade [ ] a reasonable worker from making or supporting a charge of discrimination.' "[27]

■■■ Under this standard, the Court cannot conclude that plaintiff suffered an adverse action. Although plaintiff may subjectively believe that she was disciplined, she provides no evidence to objectively show that she suffered an adverse employment action. By contrast, defendant provides evidence including the lack of any record of her alleged reprimand, and testimony of the assembly line supervisor that plaintiff was not given any oral or written reprimand for leaving the as-

**21.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**22.** *Proctor v. United Parcel Serv.,* 502 F.3d 1200, 1207–08 (10th Cir.2007).

**23.** *Id.* at 1208.

**24.** *Id.*

**25.** *Montes v. Vail Clinic, Inc.,* 497 F.3d 1160, 1176 (10th Cir.2007).

**26.** 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

**27.** *Somoza v. Univ. of Denver,* 2007 WL 4465244 at *4 (10th Cir. Dec. 21, 2007) (citing *Burlington No. in E.E.O.C. v. Pvnf LLC,* 487 F.3d 790, 803 (10th Cir.2007)).

sembly line that day. Furthermore, pursuant to the collective bargaining agreement between GM and the Auto Worker's Union, all disciplinary actions taken against an employee must be recorded. The lack of a record illustrates that plaintiff was not disciplined.

 Moreover, even assuming that plaintiff could show that she suffered an adverse action, she has not brought forth evidence to show that defendant's proffered reason for her alleged discipline is pretext. Defendant asserts that it had a legitimate reason for disciplining plaintiff for leaving the assembly line because she violated a direct order from a supervisor by going to the relations department. Thus the burden shifts to plaintiff to provide evidence of pretext. To show pretext, plaintiff may demonstrate "that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." [28] This can "be shown by such weaknesses, implausibilities, inconsistences, incoherence, or contradictions in the employer's proffered legitimate reasons for its actions." [29] A plaintiff's mere allegations alone will not defeat summary judgment here, and mere conjecture or conclusory remarks without supporting evidence will not suffice.[30] In any case, the Court need not address those concerns because plaintiff has failed to offer any evidence whatsoever to demonstrate that defendant's alleged actions were mere pretext. Accordingly, summary judgment is granted.

### 2. Termination

 Plaintiff contends that she requested accommodations for her alleged disability and was discharged nine days

later. Defendant concedes that plaintiff engaged in protected activity and that she suffered an adverse action, but maintains that there is a legitimate non-discriminatory reason for her discharge, that is, she failed to return to work within her return to work date and the time proscribed in the collective bargaining agreement. Plaintiff asserts, however, that her return to work date was not January 9, 2006, but January 22, 2006, as set by her doctor. Although plaintiff does not point to areas in the record that demonstrate that there is a genuine issue of material fact for trial, the Court's review of the record does find that there is a genuine issue of material fact as to her return to work date. Plaintiff's doctor created a document on December 29, 2005, establishing her return to work date as January 22, 2006. There is also evidence of a meeting conducted on January 5, 2006, in which plaintiff met with Ronald Mestdagh and Pamela Goodwin of the labor relations department and expressed to them that her return to work date was January 22, 2006, as provided by her doctor. Because there is a genuine issue of material fact as to whether GM was aware of the January 22, 2006 date as plaintiff's return to work date, summary judgment is denied as to this issue.

### C. Discrimination under the ADA

 To properly state a claim for discrimination under the Americans with Disabilities Act ("ADA"), plaintiff must show that she is disabled within the meaning of the Act, she was otherwise qualified for the position, and that she was discriminated against because of her disability.[31] Disability is defined as " 'a physical or mental impairment that substantially lim-

---

28. *Jencks v. Modern Woodmen of Am.,* 479 F.3d 1261, 1267 (10th Cir.2007).

29. *Id.*

30. *Id.*

31. *Corley v. Dep't of Veterans Affairs,* 218 Fed. Appx. 727, 732 (10th Cir.2007).

its one or more major life activities.' " [32] A physical impairment alone does not mean someone is disabled; the impairment must also substantially affect a major life activity.[33] This means that plaintiff must show an impairment, identify a major life activity, and show that the impairment limits that major life activity.[34]

Here, plaintiff has not provided sufficient evidence to show that she is disabled under the ADA because she cannot show that her disorder substantially limited any life activity. "To be substantially limited in a major life activity, 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.' " [35] Defendant contends that plaintiff's sleep is impaired by her work schedule and her child care responsibilities, not her disorder. In fact, plaintiff does not controvert these facts and testified in her deposition that she could not get to sleep until 2 A.M. in the morning. She would then wake at 7 A.M. to help her son get ready for school, after which she could not return to sleep because she was worried about him.

Defendant also argues that plaintiff's bipolar disorder does not affect her ability to work since two separate doctors, defendant's and plaintiff's, certified her to return to work in January 2006. This fact also is not in dispute. Plaintiff also claims that her disability prevents her from doing daily activities such as caring for herself. However, the record shows that she is able to care for her son, she is able to drive because she is now a taxi driver, and she is able to shop and calculate accurate amounts of money for that purpose. Fi-

nally, defendant contends that plaintiff can control her disorder by taking her medication. Indeed, plaintiff's doctor explained that plaintiff was not taking her medication and was out of compliance when he referred her to a new psychiatrist. Because plaintiff does not provide evidence sufficient for a trier of fact to conclude that her disorder substantially interfered with a major life activity, summary judgment is appropriate on her ADA claim.

**IT IS THEREFORE ORDERED THAT** Defendant's Motion for Summary Judgment (Doc. 39) is **GRANTED** with respect to (1) Plaintiff's hostile work environment claim; (2) Plaintiff's retaliation for leaving the assembly line claim; and (3) Plaintiff's discrimination under the ADA claim, and **DENIED** with respect to Plaintiff's claim of retaliation for requesting accommodations for her alleged disability.

**IT IS SO ORDERED.**

---

**32.** *Id.* (citing 29 U.S.C. § 705(9)(B)); *see also* 42 U.S.C. § 12102(2)(A).

**33.** *Id.*

**34.** *Poindexter v. Atchison, Topeka & Santa Fe Ry.*, 168 F.3d 1228, 1230 (10th Cir.1999).

**35.** *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir.2004) (citing *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)).